No. 25-10600

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE FIFTH CIRCUIT

Outsourcing Facilities Association; North American Custom Laboratories,
L.L.C. Partners, doing business as Farmakeio Custom Compounding,

*Plaintiffs-Appellants,*

v.

Food & Drug Administration; Dr. Marty Makary, Commissioner, U.S. Food
and Drug Administration,

*Defendants-Appellees*, and

Eli Lilly and Company,

*Intervenor- Appellee.*

On Appeal from the United States District Court
For the Northern District of Texas, No. 4:24-cv-00953-P
The Honorable Mark T. Pittman

## Opening Brief of Appellants

TY DOYLE
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, TX 77002
(713) 646-1374
tgdoyle@bakerlaw.com

ANDREW M. GROSSMAN
RICHARD B. RAILE
KRISTIN A. SHAPIRO
MARC N. WAGNER
BENJAMIN D. JANACEK
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
(202) 861-1697
agrossman@bakerlaw.com

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Further, pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel of record certifies that there are no corporations that are parents of any Petitioner or that own stock in the Petitioners.

### A. Plaintiffs-Appellants

Outsourcing Facilities Association

North American Custom Laboratories LLC Partners d/b/a FarmaKeio Custom Compounding

### B. Attorneys for Plaintiffs-Appellants

Tyler Geoffrey Doyle
Baker & Hostetler LLP
811 Main Street, Suite 1100
Houston, TX 77002

Andrew Michael Grossman
Richard Bryan Raile
Kristin Shapiro
Marc N. Wagner
Benjamin D. Janacek
Baker & Hostetler LLP
1050 Connecticut Avenue N.W., Suite 1100
Washington, D.C. 20036

Jeremy B. Kustoff
Baker & Hostetler LLP
2850 North Harwood, Suite 1100
Dallas, TX 75201

Brian Burgess
Goodwin Procter LLP
1900 N Street N.W.
Washington, D.C. 20036

## C.    Defendants-Appellees

United States Food and Drug Administration

Dr. Marty Makary

## D.    Attorneys for Defendants-Appellees

Daniel Tenny
Caroline W. Tan
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C. 20530

Oliver McDonald
David Hixon
Kimberly Ruthsatz Stephens
DOJ Civil Division
450 5th Street, N.W., Suite 6400
Washington, D.C. 20001

## E.    Intervenor-Appellee

Eli Lilly and Company

## F.    Attorneys for Intervenor Eli Lilly and Company

Dee J. Kelly, Jr.
Kelly Hart & Hallman
201 Main Street, Suite 2500
Fort Worth, TX 76102

Diana M. Watral
James F. Hurst
Ryan J. Moorman
Kirkland & Ellis LLP
333 West Wolf Point Plaza

Chicago, IL 60654

James R. P. Hileman
Kirkland & Ellis LLP
300 N LaSalle Street
Chicago, IL 60654

Jay P. Lefkowitz
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022

Paul D. Clement
Erin E. Murphy
Matthew D. Rowen
Kyle R. Eiswald
Clement & Murphy PLLC
706 Duke Street
Alexandria, VA 22314

## G.    Movant Strive Specialties Inc.

Strive Specialties Inc.

## H.    Attorneys for Strive Specialties Inc.

Mark Boesen
Boesen and Snow LLC
8501 E. Princess Dr., Suite 220
Scottsdale, AZ 85255

Derek S. Davis
Cooper & Scully PC
900 Jackson, Suite 100
Dallas, TX 75202

## I.    Amicus

Ivim Health

Novo Nordisk Inc.

## J.    Attorneys for Amicus Ivim Health

Michael E. Hassett
Harrison Steck, P.C.
515 Houston St., Suite 701
Fort Worth, TX 76102

Brian Burgess
Goodwin Procter LLP
1900 N Street, N.W.
Washington, D.C. 20036

## K.    Attorneys for Amicus Novo Nordisk Inc.

Benjamin C. Block
Daniel G. Randolph
Thomas Ross Brugato
Covington & Burling LLP
One CityCenter
850 10th St. N.W.
Washington, D.C. 20001

Trevor William Carolan
Bowman and Brooke LLP
5850 Granite Parkway, Suite 900
Plano, TX 75024

## L.    Interested Third Parties

Southwest Home Solutions LLC

FarmaKeio AR LLC

FarmaKeio Outsourcing LLC

Evexias Holding Co LLC

Sutherland Solutions LLC

JL Graves Holdings LLC

JWRD Holdings LLC

Harris Portal Solutions LLC

Nilus LLC

Daniel DeNeui

Michael Cole

Justin Graves

Cody Boatman

Robert Harris

Paul Jowell

/s/ Andrew M. Grossman
Andrew M. Grossman
*Attorney of record for Plaintiffs-Appellants*

v

## STATEMENT REGARDING ORAL ARGUMENT

This is a case of substantial public importance. At issue are GLP-1 drugs that treat serious medical conditions, which are in high demand that cannot be satisfied. Congress provided that, during shortages, pharmacies and outsourcing facilities may compound drugs to help meet demand. But the Food and Drug Administration declared the shortage over without notice-and-comment rulemaking and for arbitrary reasons lacking substantial evidence. The Court's intervention is necessary to secure continued supply of needed medicines and to clarify the operation of the statutory drug-shortage regime. Appellants respectfully request oral argument.

# TABLE OF CONTENTS

Certificate of Interested Persons ........................................................ i

Statement Regarding Oral Argument ............................................. vi

Table of Contents ............................................................................ vii

Table of Authorities ........................................................................ ix

Introduction ...................................................................................... 1

Statement of Jurisdiction ................................................................. 3

Statement of Issues ........................................................................... 3

Statement of the Case ...................................................................... 3

    A. Congress Authorizes Compounding To Ensure Patient Needs
       Are Met During Drug Shortages ......................................... 3

    B. FDA Drops Tirzepatide from the Shortage List and Then
       Refuses To Defend Its Decision ........................................ 6

    C. FDA Again Declares the Shortage Over, Relying on Lilly's
       Representations While Waving Away All Other Evidence ............... 8

    D. The District Court Upholds the Delisting Action by
       Exempting FDA from Notice-and-Comment Rulemaking
       and from Any Obligation to Explain the Parameters ...................... 10

Summary of the Argument ........................................................... 12

Standard of Review ........................................................................ 13

Argument ......................................................................................... 13

I.    The Delisting Action Was Unlawfully Promulgated Without
    Notice-and-Comment Rulemaking ...................................... 13

    A. The Delisting Action Is a Rulemaking ........................... 14

    B. The Delisting Action Is Not the Proper Subject of Adjudication ..... 20

C. The Delisting Action Must Be Set Aside........................................ 27

II. The Delisting Action Is Arbitrary and Without a Reasoned Basis........ 31

██████████████████████████████████████████............... 32

██████████████████████████████████████████████......... 40

████████████████████████████████████████████......... 44

████████████████████████████████████████.............. 46

Conclusion ............................................................................... 52

# TABLE OF AUTHORITIES

## Cases

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
    522 U.S. 359 (1998) ............................................................................ 39

*Amin v. Mayorkas*,
    24 F.4th 383 (5th Cir. 2022) ................................................................ 31

*Anne Arundel Cnty. v. U.S. EPA*,
    963 F.2d 412 (D.C. Cir. 1992) ............................................................ 16

*Apter v. Dep't of Health & Hum. Servs.*,
    80 F.4th 579 (5th Cir. 2023) ................................................................ 15

*Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of Fed. Rsrv. Sys.*,
    745 F.2d 677 (D.C. Cir. 1984) ............................................................ 17

*Ass'n of Priv. Colleges & Univs. v. Duncan*,
    870 F.Supp.2d 133 (D.D.C. 2012) ...................................................... 39

*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204 (1988) ............................................................................ 22

*Ctr. for Biological Diversity v. Everson*,
    435 F.Supp.3d 69 (D.D.C. 2020) ........................................................ 16

*Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*,
    698 F.Supp.3d 39 (D.D.C. 2023) ........................................................ 16

*Chamber of Com. of United States of Am. v. United States Dep't of Lab.*,
    885 F.3d 360 (5th Cir. 2018) .............................................................. 31

*Citizens for Resp. & Ethics in Washington v. FEC*,
    993 F.3d 880 (D.C. Cir. 2021) ............................................................ 17

*City of Arlington, Tex. v. FCC*,
    668 F.3d 229 (5th Cir. 2012) ............................................... 20–22, 25

*Corrosion Proof Fittings v. EPA*,
    947 F.2d 1201 (5th Cir. 1991), *opinion clarified* (Nov. 15, 1991)................ 36

ix

*Dep't of Com. v. New York,*
  588 U.S. 752 (2019) ................................................................. 31

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
  591 U.S. 1 (2020).......................................................... 27, 28, 36

*Dep't of Labor v. Kast Metals Corp.,*
  744 F.2d 1145 (5th Cir. 1984) ................................................. 14

*Goodman v. FCC,*
  182 F.3d 987 (D.C. Cir. 1999) ................................................. 26

*Green Rock LLC v. Internal Revenue Serv.,*
  104 F.4th 220 (11th Cir. 2024) ............................................... 16

*Home Box Office, Inc. v. FCC,*
  567 F.2d 9 (D.C. Cir. 1977) .................................................... 31

*Idaho Farm Bureau Fed'n v. Babbitt,*
  58 F.3d 1392 (9th Cir. 1995) .................................................. 16

*Lake Carriers' Ass'n v. EPA,*
  652 F.3d 1 (D.C. Cir. 2011) .................................................... 17

*Louisiana v. United States Dep't of Energy,*
  90 F.4th 461 (5th Cir. 2024) ...............................27, 28, 36, 37

*Mann Constr., Inc. v. United States,*
  27 F.4th 1138 (6th Cir. 2022) ........................................... 15–18

*Marcello v. Bonds,*
  349 U.S. 302 (1955) ............................................................. 17

*McDonald v. Watt,*
  653 F.2d 1035 (5th Cir. 1981)...........................................21, 24

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Ins. Co.,*
  463 U.S. 29 (1983)...............................................31, 32, 36, 38

*Nat'l Ass'n of Farmworkers Orgs. v. Marshall,*
  628 F.2d 604 (D.C. Cir. 1980) ............................................... 16

*Nat'l Min. Ass'n v. McCarthy,*
758 F.3d 243 (D.C. Cir. 2014) ............................................................ 15

*Nat'l Parks Conservation Ass'n v. EPA,*
788 F.3d 1134 (9th Cir. 2015) ............................................................ 37

*Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.,*
942 F.3d 1154 (D.C. Cir. 2019) .......................................................... 45

*Nat. Res. Def. Council v. Wheeler,*
955 F.3d 68 (D.C. Cir. 2020) .............................................................. 16

*New England Health Care Emps. Union v. NLRB,*
448 F.3d 189 (2d Cir. 2006) ............................................................... 39

*NLRB v. Bell Aerospace Co. Div. of Textron,*
416 U.S. 267 (1974) ........................................................................... 24

*NLRB v. Wyman-Gordon Co.,*
394 F.3d 759 (1969) ........................................................................... 22

*NRDC v. Nat'l Highway Traffic Safety Admin.,*
894 F.3d 95 (2d Cir. 2018) ................................................................. 14

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.,*
477 F.3d 668 (9th Cir. 2007) .............................................................. 39

*Omnipoint Corp. v. FCC,*
78 F.3d 620 (D.C. Cir. 1996) .............................................................. 19

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.,*
494 F.3d 188 (D.C. Cir. 2007) ............................................................ 37

*Perez v. Mortgage Bankers Ass'n,*
575 U.S. 92 (2015) ................................................................ 14, 15, 28

*Process Gas Consumers Grp. v. FERC,*
177 F.3d 995 (D.C. Cir. 1999) ............................................................ 39

*Pros. & Patients for Customized Care v. Shalala,*
56 F.3d 592 (5th Cir. 1995) ................................................................ 20

*Pub. Citizen v. Nuclear Regul. Comm'n,*
   573 F.3d 916 (9th Cir. 2009) ................................................. 19

*Qwest Servs. Corp. v. FCC,*
   509 F.3d 531 (D.C. Cir. 2007) .............................................. 26

*Safari Club Int'l v. Zinke,*
   878 F.3d 316 (D.C. Cir. 2017) ................................ 20, 22–24, 26

*Shell Offshore Inc. v. Babbitt,*
   238 F.3d 622 (5th Cir. 2001) .............................. 13–15, 23, 24

*SKF USA Inc. v. United States,*
   630 F.3d 1365 (Fed. Cir. 2011) ............................................ 39

*Sutter E. Bay Hosps. v. NLRB,*
   687 F.3d 424 (D.C. Cir. 2012) .............................................. 46

*Sw. Elec. Power Co. v. EPA,*
   920 F.3d 999 (5th Cir. 2019) ............................................... 31

*Thompson v. W. States Med. Ctr.,*
   535 U.S. 357 (2002) ............................................................... 4

*United Distrib. Cos. v. FERC,*
   88 F.3d 1105 (D.C. Cir. 1996) .............................................. 39

*United States v. Fla. E. Coast Ry. Co.,*
   410 U.S. 224 (1973) ............................................................. 22

*U.S. Air Tour Ass'n v. FAA,*
   298 F.3d 997 (D.C. Cir. 2002) .............................................. 36

*Univ. of Texas M.D. Anderson Cancer Ctr. v. DHS,*
   985 F.3d 472 (5th Cir. 2021) .......................................... 13, 31

*Wages & White Lion Invs., L.L.C. v. FDA,*
   16 F.4th 1130 (5th Cir. 2021) .............................................. 39

*W&T Offshore, Inc. v. Bernhardt,*
   946 F.3d 227 (5th Cir. 2019) .................................... 20, 24, 29

*Yesler Terrace Cmty. Council v. Cisneros*,
37 F.3d 442 (9th Cir. 1994) ..............................................................25, 27

**Statutory and Regulatory Authorities**

5 U.S.C. § 533.......................................................................................... 28

5 U.S.C. § 551.......................................................................................... 15

5 U.S.C. § 552.......................................................................................... 49

5 U.S.C. § 553.........................................................................14, 18, 20, 24

5 U.S.C. § 559...........................................................................8, 17, 18, 24

5 U.S.C. § 706..............................................................................13, 31

21 U.S.C. § 353a ..................................................................................4, 5, 50

21 U.S.C. § 353b ..................................................................................4–6, 50

21 U.S.C. § 356c ...................................................................5, 19, 32, 44, 48

21 U.S.C. § 356e ....................................................................5, 18, 19, 39

28 U.S.C. § 1331 ..................................................................................... 3

FDA, Consumer Comments—Public Posting and Availability of
Comments Submitted to Food and Drug Administration Dockets,
80 Fed. Reg. 56469 (Sept. 18, 2015)........................................... 20

FDA, Medicare and Medicaid Programs; Policy and Regulatory Provisions
in Response to the COVID-19 Public Health Emergency
85 Fed. Reg. 19230 (Apr. 6, 2020) ............................................. 18

FDA, Procedures for Handling Confidential Information in Rulemaking,
60 Fed. Reg. 66981 (Dec. 27, 1995) ........................................... 20

**Other Authorities**

APhA, Frequently Asked Questions About Pharmaceutical Compounding .. 21

Bridget C.E. Dooling, Legal Issues in E-Rulemaking,
63 Admin. L. Rev. 893 (2011) .................................................... 20

Christopher S. Yoo & Kellen McCoy, Privacy vs. Transparency:
    Handling Protected Materials in Agency Rulemaking,
    96 Ind. L. J. 1259 (2021) ........................................................ 19

FDA, Compounding Outsourcing Facilities Annual
    Study (Aug. 18, 2020) ............................................................. 21

FDA, Compounding when Drugs are on FDA's Drug
    Shortages List (Dec. 18, 2024) ................................................. 6

FDA, FDA clarifies policies for compounders as national GLP-1 supply
    begins to stabilize (Dec. 19, 2024) ......................................... 30

FDA, Registered Outsourcing Facilities (July 29, 2025) .............................. 21

Heather Kilgore, Signed, Sealed, Protected: Solutions to Agency
    Handling of Confidential Business Information in Informal Rulemaking,
    56 Admin. L. Rev. 519 (2004) ................................................. 19

Kristin Hickman, It's Time To Let Go: Treasury Regulations
    Are Not Interpretative Rules, Tax Notes, (June 16, 2022)....................... 29

Nicholas Parillo, Should the Public Get to Participate Before Federal
    Agencies Issue Guidance?,
    71 Admin. L. Rev. 57 (2019)................................................... 29

Penn State University, Financial and Managerial Accounting,
    2.6 Accounting for Inventory ................................................. 35

Russ Britt, MarketWatch, 'Big Three' pharma distributors
    post sharp gain (Sept. 15, 2010) ............................................. 47

Webster's New World College Dictionary (4th ed. 2007) ....................... 40, 48

## INTRODUCTION

This case concerns tirzepatide, an active ingredient in FDA-approved GLP-1 drugs that treat type-2 diabetes and obesity. Surging demand from the moment tirzepatide hit the market in 2022 led the Food and Drug Administration (FDA) to declare it in shortage that December. The shortage declaration loosened restrictions on compounding tirzepatide. Compounding is the process by which a doctor, pharmacist, or licensed outsourcing facility combines, mixes, or alters ingredients to create medicines tailored to patient needs. For years, patient needs and market demand for tirzepatide were satisfied in meaningful part by the lawful compounding of pharmacies and outsourcing facilities.

In late 2024, at the behest of Eli Lilly and Company (Lilly), the manufacturer of brand name tirzepatide products—and with next to no information about market conditions—FDA abruptly declared the shortage over. This decision immediately rendered most tirzepatide compounding illegal. When challenged in court, FDA promptly yielded and asked for a do-over. After collaborating with Lilly, FDA again declared the shortage over, this time with more paperwork. But these documents do not show that Lilly can satisfy the market for tirzepatide. FDA's showings of supply and demand ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████████

1

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████ Rather than scrutinize the totality of the evidence, FDA waved away everything inconsistent with its misunderstanding ███████████

The district court upheld FDA's decision on grounds of startling breadth. It first held that FDA was not obliged to engage in notice-and-comment rulemaking under the Administrative Procedure Act (APA), even though its delisting decision prospectively imposes a blanket prohibition on an entire industry. This was erroneous. A prospective ban is a legislative rule, and nothing in the relevant statutes displaces the APA's default procedures. The district court went even further off course in dismissing alternative arbitrary-and-capricious claims by holding that, because FDA did not utilize notice-and-comment rulemaking, it did not need to explain its parameters as would have been required during notice-and-comment rulemaking. This is wrong. Binding precedent could not be clearer that the reasoned decision-making standard applies to *all* agency action and provides the *same* dictates as govern during notice-and-comment rulemaking. If adopted, the district court's wayward view would liberate agencies from APA dictates and end judicial review of agency action as it has existed for generations.

The Court should correct the errors of the district court and the agency, reverse the judgment below, and direct the district court to vacate FDA's action and remand for further agency review.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over Plaintiffs' federal claims under 28 U.S.C. § 1331. It granted summary judgment on all claims on May 7, 2025, ROA.4658, and entered final judgment on May 13, ROA.1579. Plaintiffs appealed on May 7, ROA.1558, and the notice of appeal is deemed filed as of May 13, Fed. R. App. P. 4(a)(2). The appeal is timely.

## STATEMENT OF ISSUES

1. Whether agency action decreeing a prospective prohibition across an entire industry may bypass notice-and-comment rulemaking because the agency labels it an "adjudication."

2. Whether FDA's shortage resolution is supported by substantial evidence and reasoned explanation where the agency failed to identify and explain its parameters and the evidence strongly indicated that a shortage persists.

## STATEMENT OF THE CASE

### A. Congress Authorizes Compounding To Ensure Patient Needs Are Met During Drug Shortages

1. Drug compounding, "a process by which a pharmacist or doctor combines, mixes, or alters ingredients to create a medication," is "a traditional component of the practice of pharmacy, and is taught as part of the standard

3

curriculum at most pharmacy schools." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 360–61 (2002) (citation omitted). "Many States specifically regulate compounding practices as part of their regulation of pharmacies," and "[s]ome require all licensed pharmacies to offer compounding services." *Id.* The Federal Food, Drug, and Cosmetic Act (FDCA) regulates drug compounding in Sections 503A and 503B.

Titled "Pharmacy compounding," Section 503A exempts compounding at licensed pharmacies from certain FDCA requirements, including its new-drug-approval prerequisites, if multiple conditions are met. 21 U.S.C. § 353a(a). Among other things, a drug must be compounded at a licensed pharmacy "on the prescription order for [an] individual patient" or "based on a history of the licensed pharmacist or licensed physician receiving valid prescription orders for the compounding of the drug product." *Id.* § 353a(a)(2)(A) and (B). Section 503A authorizes compounding from "bulk drug substances," which are active ingredients typically of FDA-approved drugs, so long as the pharmacy "does not compound regularly or in inordinate amounts … any drug products that are essentially copies of a commercially available drug product." *Id.* § 353a(b)(1)(D).

Section 503B governs "outsourcing facilities," which generally engage in larger-scale compounding than pharmacies, and exempts their compounding from the FDCA's new-drug-approval requirement and other restrictions if those facilities fulfill numerous conditions. *Id.* § 353b(a)(1) and (b). Outsourcing facilities need not be licensed pharmacies or compound in response to prescriptions or a history of prescriptions. *Id.* § 353b(d)(4)(B) and (C). They

must, however, conform with stringent good manufacturing practices that do not apply to Section 503A pharmacies. *Compare id.* § 353a(a) *with id.* § 353b(a); *id.* § 351(a)(2)(B).

2.   To ensure continuity in patient care, Congress authorized pharmacies and outsourcing facilities to help meet demand during drug shortages.

Section 506E requires FDA to "maintain an up-to-date list of drugs that are determined by" FDA "to be in shortage in the United States." 21 U.S.C. § 356e(a). FDA must identify "[t]he name of the drug in shortage," "[t]he name of each manufacturer of such drug," "[t]he reason for the shortage" from an enumerated list of seven categories, and "[t]he estimated duration of the shortage as determined by the Secretary." *Id.* § 356e(b)(1)–(4). The FDCA defines "drug shortage" to mean "a period of time when the demand or projected demand for the drug within the United States exceeds the supply of the drug." *Id.* § 356c(h)(2).

A shortage listing authorizes compounding that would otherwise be prohibited. As noted, Section 503A does not protect pharmacy compounding "in inordinate amounts" of "any drug products that are essentially copies of a commercially available drug product," *id.* § 353a(b)(1)(D), but a shortage listing signals that the drug is not "commercially available," allowing pharmacies to compound copies of listed drugs. *See* FDA, Compounding when Drugs are on

5

FDA's Drug Shortages List (Dec. 18, 2024).[1] A shortage listing also authorizes outsourcing facilities to compound from that drug's active ingredient—which is generally otherwise prohibited—and to compound drugs that are "essentially a copy" of an approved drug, which is also generally otherwise prohibited. 21 U.S.C. § 353b(a)(2)(A)(2), (a)(5), (d)(2)(A). In plain English: pharmacies generally may copy brand-name drugs only during a shortage, and outsourcing facilities generally cannot compound from the active ingredients of brand-name drugs, except when a drug is in shortage.

### B. FDA Drops Tirzepatide from the Shortage List and Then Refuses To Defend Its Decision

1. Tirzepatide is the active ingredient of FDA-approved prescription drugs that treat type-2 diabetes and obesity. Tirzepatide is manufactured by Eli Lilly & Co. (Lilly) and sold under the brand names Mounjaro for diabetes treatment and Zepbound for weight loss. ROA.3968. Demand for tirzepatide is exceptionally high and continues to grow rapidly. ROA.3968; ROA.3979.

On December 15, 2022, FDA added tirzepatide injection products to the shortage list. ROA.3965. This enabled pharmacies and outsourcing facilities to satisfy patient needs through compounding. Since then, market demand has been met in meaningful part by compounded products. ROA.3987 ("We acknowledge reports of significant compounding."); ROA.3990 ("a substantial

---

[1] *Available at* https://www.fda.gov/drugs/human-drug-compounding/compounding-when-drugs-are-fdas-drug-shortages-list.

volume"). In fact, notwithstanding the substantial supply compounders provided, patient needs still went unfulfilled or met delays.

On October 2, 2024, FDA's website abruptly declared the shortage over. The agency's scant explanation indicated that the decision was premised entirely on Lilly's representation that its "stated product availability and manufacturing capacity can meet the present and projected national demand." ROA.50. Nonetheless, FDA's notice warned of continuing "intermittent localized supply disruptions," ROA.50, and stated in tirzepatide entries in its database: "Even When A Medication Is Available, Patients May Not Always Be Able To Immediately Fill Their Prescription At A Particular Pharmacy," ROA.54.

The record shows FDA knew nothing about Lilly's ability to meet demand: it did not know what the supply or demand was for any time period. Leading into the October decision, ███████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████

2.    This lawsuit followed immediately. Plaintiff North American Custom Laboratories, LLC, doing business as FarmaKeio Custom

Compounding ("FarmaKeio"), is a pharmacy that compounded tirzepatide in reliance on the shortage listing. ROA.123. Plaintiff Outsourcing Facilities Association (OFA) is a trade association representing outsourcing facilities. ROA.125. OFA members compounded tirzepatide in reliance on FDA's shortage listing. ROA.125; ROA.1109. FDA's shortage resolution restricts or prevents tirzepatide compounding by FarmaKeio and OFA's members.

Plaintiffs sought emergency provisional relief. ROA.25; ROA.77; ROA.90. Rather than defend its action, FDA moved for a voluntary remand to "reevaluate the challenged decision," ROA.295, which the district court granted, ROA.302. Meanwhile, the shortage did not abate. ███████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

### C. FDA Again Declares the Shortage Over, Relying on Lilly's Representations While Waving Away All Other Evidence

On December 19, 2024, FDA again declared the tirzepatide shortage over. This "**Delisting Action**" is memorialized in two documents. The "**Decision**" presents the agency's evidence and reasoning for the Act. ROA.3965. And the "**Order**" summarizes the agency's rationale, argues that the agency properly acted through "informal adjudication" instead of notice-and-comment rulemaking, and provides enforcement discretion for compounding of tirzepatide products by pharmacies and outsourcing facilities of, respectively, 60 and 90 days. ROA.3953.

Like its predecessor, the Delisting Action rests on ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████ ██████ █████ ██████ ███████ ██████ █

████████████████████████████████████████████████████████



### D. The District Court Upholds the Delisting Action by Exempting FDA from Notice-and-Comment Rulemaking and from Any Obligation to Explain the Parameters

After the Delisting Action issued, FDA and Plaintiffs jointly moved to reopen the action in the district court, ROA.356; ROA.444, and Plaintiffs filed an amended complaint challenging the Delisting Action, ROA.813. Lilly intervened as a defendant. ROA.325; ROA.391; ROA.394. Plaintiffs then filed a second preliminary-injunction motion. ROA.445. However, because FDA had not yet made the administrative record available, the district court did not consolidate the preliminary-injunction motion with the merits. ROA.444.

On March 5, 2025, the district court issued an order denying Plaintiffs' preliminary injunction motion, finding Plaintiffs unlikely to succeed on the merits. ROA.1915. The court found that the Delisting Action did not require notice-and-comment rulemaking under the APA, even as it admitted that "the regulatory scheme is seemingly silent as to what procedure the FDA must use to make its shortage determinations." ROA.1921. The district court found that

FDA could permissibly label its action an "adjudication" and thereby bypass the APA's default rulemaking requirements. ROA.1922–31. The court also found the Delisting Action supported by sufficient evidence and reasoning. ROA.1932–42.

Plaintiffs appealed and moved this Court to expedite the appeal. *OFA v. FDA*, No. 25-10385, ECF No. 23 (5th Cir. Mar. 14, 2025). But the district court imposed an expedited summary-judgment briefing schedule indicating that final judgment would be issued before Plaintiffs' appeal could be decided. ROA.1140. Accordingly, Plaintiffs voluntarily dismissed the appeal.[2] *Id.* ECF Nos. 115, 116.

On May 7, 2025, the district court granted Defendants' motions for summary judgment and denied Plaintiffs'. The Court incorporated its prior ruling finding that notice-and-comment rulemaking was unnecessary for the Delisting Action, and found again that the Delisting Action was supported by sufficient evidence and reasoning. ROA.4658. The court entered final judgment.

---

[2] The district court thwarted Plaintiffs' ability to pursue an appeal through unusual rulings. It denied FDA's unopposed motion to stay proceedings pending appeal, ROA.1153, and a motion by all parties for judgment to be entered against Plaintiffs, ROA.1183. After these rulings, Plaintiffs moved for an injunction pending appeal in the district court and in this Court, and both motions were denied. ROA.1199; *OFA v. FDA*, No. 25-10385, ECF Nos. 59, 98 (5th Cir. Mar. 27, Apr. 4, 2025).

## SUMMARY OF THE ARGUMENT

I.    FDA unlawfully promulgated the Delisting Action without notice-and-comment rulemaking. It is a substantive rule that makes previously lawful conduct unlawful and therefore triggers the APA's default notice-and-comment obligation, which the FDCA does not displace. While FDA labels the Delisting Action an adjudication, it bears all hallmarks of a rule. It is generally applicable to a large industry of unspecified regulated entities and does not adjudicate the rights of any named parties. And it creates a prospective, legislative bar on activity rather than decides the legality of anyone's past activities. FDA cannot circumvent the APA's rulemaking requirements by slapping the "adjudication" label on what is by all measures a rule.

II.    FDA also violated the APA by declaring the shortage over without coherent findings satisfying statutory command, sufficient factual basis, or reasoned consideration of a mountain of contrary evidence. FDA claimed to implement a statutory directive requiring findings of (1) supply and (2) demand over (3) a period of time, but it crashed off that path at the first turn through its ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████ This cannot survive APA review, and the district court erred in effectively giving the agency a blank check to act with no meaningful judicial review.

12

## STANDARD OF REVIEW

"This Court reviews the district court's grant of summary judgment *de novo*." *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 627 (5th Cir. 2001). In reviewing the underlying agency decision, "the general standard under the APA is whether the agency's final decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)). However, determining whether the Delisting Action "was a 'rule' for APA purposes is purely a matter of construction of the APA and [this Court] review[s] this issue *de novo*." *Id.* The Court exercises "searching and careful" review under the APA to assess whether "an agency examine[s] the relevant data and articulate[s] a satisfactory explanation for its action." *Univ. of Texas M.D. Anderson Cancer Ctr. v. DHS*, 985 F.3d 472, 475 (5th Cir. 2021) (citation omitted).

## ARGUMENT

### I.   The Delisting Action Was Unlawfully Promulgated Without Notice-and-Comment Rulemaking

FDA erroneously issued the Delisting Action without notice-and-comment rulemaking. The Delisting Action is a substantive rule—it makes previously lawful conduct unlawful—and not the product of an "adjudication," as FDA erroneously contends. This is not the first time that an agency has sought to circumvent the APA's rulemaking requirements by affixing the "adjudication" label to a generally applicable action, and the district court erred in excusing FDA from the notice-and-comment strictures that "are basic to our

13

system of administrative law." *NRDC v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 115 (2d Cir. 2018).

## A.    The Delisting Action Is a Rulemaking

Congress imposed the APA's notice-and-comment procedures "to give the public an opportunity to participate in the rule-making process" and "enable[] the agency promulgating the rule to educate itself" before taking actions that "have a substantial impact on those who are regulated." *Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 n.17 (5th Cir. 1984) (quotation marks omitted). To those ends, the APA prescribes a "three-step procedure." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015). "First, the agency must issue a '[g]eneral notice of proposed rule making,' ordinarily by publication in the Federal Register." *Id.* (quoting 5 U.S.C. § 553(b)). Second, "the agency must 'give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments.'" *Id.* (quoting 5 U.S.C. § 553(c)). The agency then "must consider and respond to significant comments." *Id.* And, third, the final rule must include "'a concise general statement of [its] basis and purpose.'" *Id.* (quoting 5 U.S.C. § 553(c)). These procedures are generally applicable and are required for the promulgation of what are known as "substantive" or "legislative" rules—that is, "those which create law." *Shell Offshore*, 238 F.3d at 628.

1.    The Delisting Action is a substantive rule subject to the APA's notice-and-comment mandate. To begin with, it is a rule. The APA defines "rule" to include "the whole or a part of an agency statement of general or

particular applicability and future effect designed to implement, interpret, or prescribe law or policy," 5 U.S.C. § 551(4), and that reaches "virtually every statement an agency may make," *Apter v. Dep't of Health & Hum. Servs.*, 80 F.4th 579, 590 (5th Cir. 2023). The Delisting Action is a statement of general applicability to all compounders that prescribes law by prohibiting most tirzepatide compounding. Specifically, the action prohibits all compounding of tirzepatide by outsourcing facilities and prohibits pharmacies from compounding drugs that are essentially a copy of brand-name tirzepatide products.

The Delisting Action is a substantive rule because it has "the force and effect of law." *Perez*, 575 U.S. at 96 (quotation marks omitted). In other words, it "affect[s] individual rights and obligations." *Shell Offshore*, 238 F.3d at 628 (quotation marks omitted); *see also Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1143 (6th Cir. 2022) (explaining that a substantive rule is one that "impose[s] new rights or duties and change[s] the legal status of regulated parties"). The Delisting Action changed the law, and affected the rights of compounders, by making a previously lawful activity (compounding tirzepatide) unlawful on a prospective basis, no different in force and effect than if Congress had enacted a statute prohibiting that activity. This is a rule.

This conclusion is straightforward. Agency action erecting a new legal prohibition is the classic example of a substantive rule. *See Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014). More specifically, many statutory schemes base legal consequences on agencies' listing decisions that have

consistently been recognized as substantive rules subject to notice and comment. For example, recent decisions of the Sixth and Eleventh Circuits hold that the IRS's actions adding new items to a list of presumptively abusive transactions, which trigger reporting requirements, were substantive rules and invalid without notice-and-comment procedures. *Green Rock LLC v. Internal Revenue Serv.*, 104 F.4th 220 (11th Cir. 2024); *Mann Constr.*, 27 F.4th at 1138. The EPA's adding a site on the CERCLA "national priorities list," which then triggers various remedial obligations, is a substantive rule subject to the APA's notice-and-comment procedures. *See Anne Arundel Cnty. v. U.S. EPA*, 963 F.2d 412 (D.C. Cir. 1992). So too are actions adding species to the lists of threatened and endangered species under the Endangered Species Act. *See Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1401–04 (9th Cir. 1995); *Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 698 F.Supp.3d 39 (D.D.C. 2023); *Ctr. for Biological Diversity v. Everson*, 435 F.Supp.3d 69 (D.D.C. 2020). And so too are actions adding pesticides to the list of those safe to use around younger workers. *Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604 (D.C. Cir. 1980). Removing items from lists, where doing so changes the law, is identically subject to notice-and-comment procedures; that includes, for example, EPA's action suspending the listing of hydrofluorocarbons as an unsafe substitute for ozone-depleting substances prohibited under Clean Air Act. *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020) (vacating action on that basis).

It is easy to see why such listing and delisting actions are rules. There is no difference between an agency rule providing that "compounding of

tirzepatide is prohibited" and an agency action removing tirzepatide from a list of substances that may lawfully be compounded. In either instance, the agency has changed the law by promulgating a new legal prohibition. To change the law, an agency must follow the APA's notice-and-comment procedures.

2. Nothing in the FDCA displaces the APA's notice-and-comment procedures for FDA's shortage listing and delisting actions. "Before an agency may regulate without the protections of the notice-and-comment process, it must show that Congress 'expressly' carved out the exception." *Mann Constr.*, 27 F.4th at 1144 (quoting 5 U.S.C. § 559). Such exemptions "are not lightly to be presumed," *Marcello v. Bonds*, 349 U.S. 302, 310 (1955); instead, "Congress's *intent to make a substantive change* [must] be clear," *Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 686 (D.C. Cir. 1984) (citation omitted). Importantly, it is *not* enough that a statute prescribes procedures that cover some of the same ground as the APA procedures (such as publication) but are not incompatible with them. *See, e.g.*, *Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 6 (D.C. Cir. 2011) (Clean Water Act's express notice-and-comment process did not excuse EPA "from providing an additional round of notice and comment" before promulgating final permits); *Mann Constr.*, 27 F.4th at 1145–46 (reporting and disclosure regime did not displace APA's notice-and-comment requirements); *Citizens for Resp. & Ethics in Washington v. FEC*, 993 F.3d 880, 890 (D.C. Cir. 2021) (enforcement provisions of Federal Election Campaign Act did not displace APA's default judicial-review provisions).

Section 506E bespeaks no intent, let alone a clear one, to displace notice-and-comment procedures entirely. The district court correctly recognized that the FDCA "is seemingly silent as to what procedure the FDA must use to make its shortage determinations." ROA.1921. But silence is the opposite of an *express* exemption.

While neither FDA nor the district court directly argued to the contrary, they indirectly claimed displacement by noting that FDA must "maintain an up-to-date list of drugs that are determined … to be in shortage," 21 U.S.C. § 356e(a), and that FDA may rely on confidential information of drug manufacturers in assessing shortages, *see* ROA.1922–25; ROA.3959. These directives are insufficient to establish that Section 506E "expressly" supersedes the default notice-and-comment requirement. 5 U.S.C. § 559. Moreover, both directives are "compatible" with notice-and-comment processes. *Mann Constr.*, 27 F.4th at 1145. The APA specifically authorizes agencies to forgo notice-and-comment for "good cause" and to refrain from publishing rules "exempted from disclosure by statute." 5 U.S.C. § 553(b)(B). This flexibility empowers FDA to immediately list a drug when evidence of a shortage suddenly appears and to keep submitted information sealed.

Indeed, agencies routinely act with great dispatch in rulemaking. FDA has relied on the APA's "good cause" exception to address temporary or urgent needs through, for example, interim final rules. *E.g.*, 85 Fed. Reg. 19230 (Apr. 6, 2020) (interim final rule by FDA's sister agency making temporary changes to Medicare and Medicaid rules during pandemic). And agencies have

18

employed shorter-than-usual comment periods where statutes directed expedition. *See Omnipoint Corp. v. FCC*, 78 F.3d 620, 629 (D.C. Cir. 1996) (approving seven-day comment period where Congress directed agency to act "without … delays"). This flexibility precludes any claim of conflict between the APA's rulemaking requirements and the statutory scheme here. Section 506E expressly contemplates that shortages may result from events providing more-than-adequate time for notice and comment, including "[d]iscontinuance of the manufacture of a drug," delays in bringing compliant manufacturing capacity online, regulatory delays, and demand growth. 21 U.S.C. § 356e(b)(3). Consistent with that understanding, the related reporting requirement of Section 506C allows "30 calendar days" and "40 calendar days" for action in instances where manufacturers may have failed to provide notification of a shortage. 21 U.S.C. § 356c(e) and (f)(2)–(3). There's ample time for notice and comment in most instances—including *all* shortage resolutions—and the "good cause" exception clearly covers any abrupt shortage.

Likewise, agencies routinely accept, consider, and protect confidential materials in APA notice-and-comment rulemakings. *See generally* Heather Kilgore, Signed, Sealed, Protected: Solutions to Agency Handling of Confidential Business Information in Informal Rulemaking, 56 Admin. L. Rev. 519 (2004); Christopher S. Yoo & Kellen McCoy, Privacy vs. Transparency: Handling Protected Materials in Agency Rulemaking, 96 Ind. L. J. 1259 (2021); Bridget C.E. Dooling, Legal Issues in E-Rulemaking, 63 Admin. L. Rev. 893, 911–13 (2011); *Pub. Citizen v. Nuclear Regul. Comm'n*, 573 F.3d 916, 928

19

(9th Cir. 2009) (holding that an agency properly relied on "classified information about nuclear facilities" in rulemaking). FDA itself has published "Procedures for Handling Confidential Information in Rulemaking," which apply to all FDA "rulemaking." 60 Fed. Reg. 66,981, 66,981 (Dec. 27, 1995); *see also* FDA, Consumer Comments—Public Posting and Availability of Comments Submitted to Food and Drug Administration Dockets, 80 Fed. Reg. 56,469 (Sept. 18, 2015) (updating 1995 policy).

### B.    The Delisting Action Is Not the Proper Subject of Adjudication

Unwilling to conduct a public rulemaking, FDA insists that its Delisting Action is "the product of an informal adjudication." ROA.3957. The district court erred in blessing this superficial repackaging. ROA.1920–31; ROA.4660–61.

1.    For many of the reasons that it qualifies as a substantive rule, the Delisting Action "bear[s] all the hallmarks … of rulemaking, not adjudication." *City of Arlington, Tex. v. FCC,* 668 F.3d 229, 242 (5th Cir. 2012). "An agency may not escape the requirements of § 553 by labeling its rule an 'adjudication.'" *Safari Club Int'l v. Zinke*, 878 F.3d 316, 332 (D.C. Cir. 2017). An "agency's characterization of its own [action]" is due "minimal" deference; instead, "courts focus primarily on the actual characteristics of the agency action." *W & T Offshore*, 946 F.3d at 237 (citation and alteration marks omitted); *see also Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 596 (5th Cir. 1995). Two features of the Delisting Action establish that it is a rule, not the product of adjudication.

First, the Delisting Action creates a generally applicable legal prohibition, which "is classic rulemaking." *City of Arlington*, 668 F.3d at 243. Adjudications typically "resolve disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals." *Id.* at 242 (quotation marks omitted); *see also McDonald v. Watt*, 653 F.2d 1035, 1042 (5th Cir. 1981) ("The existence of a dispute concerning particular individuals is a distinguishing characteristic of adjudication."). The Delisting Action is generally applicable and indiscriminately affects the rights of thousands of pharmacies and outsourcing facilities. The American Pharmacists Association reports that "about 7,500 pharmacies specialize in compounding," not including compounding pharmacies in hospitals and other health care facilities.[3] FDA identifies 93 outsourcing facilities,[4] including large facilities engaged in "high-volume" production.[5] This was not an adjudication of "the rights of a small number of parties properly before [the agency]." *City of Arlington*, 668 F.3d at 243.

In fact, *none* of the pharmacies and facilities whose rights were the object of this so-called "adjudication" were party to it. "No effort was made to single

---

[3] APhA, Frequently Asked Questions About Pharmaceutical Compounding, *available at* https://www.pharmacist.com/Practice/Patient-Care-Services/Compounding/Compounding-FAQs.

[4] FDA, Registered Outsourcing Facilities (July 29, 2025), *available at* https://www.fda.gov/drugs/human-drug-compounding/registered-outsourcing-facilities.

[5] FDA, Compounding Outsourcing Facilities Annual Study (Aug. 18, 2020), *available at* https://www.fda.gov/media/163704/download.

out any particular [compounder] for special consideration based on its own peculiar circumstances." *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 246 (1973). Lilly was also not a party to this "adjudication," and neither the Decision nor Order identify it as one.[6] The Decision and Order identify no parties and do not apply any legal rule or determination to any person. There was no adjudication here. FDA simply announced a new legal restriction applicable to an entire industry. That is a rule. *Compare NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 765–66 (1969) (plurality op.) (holding agency was required to proceed through APA rulemaking when it "purported to make a rule"—that is, "exercise its quasi-legislative power"—through adjudication).[7]

Second, the Delisting Action creates a future prohibition rather than evaluates past actions. "[R]ules generally have only 'future effect' while adjudications immediately bind parties by retroactively applying law to their past actions." *Safari Club*, 878 F.3d at 333; *see also City of Arlington*, 668 F.3d at 243 (emphasizing that FCC order "would apply prospectively"). As Justice Scalia put it, "[a]djudication deals with what the law was; rulemaking deals with what the law will be." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 221 (1988) (Scalia, J., concurring). The Delisting rule's effect is, as FDA recognizes, purely prospective. ROA.3961–62 (addressing the "Status of Compounding Following

---

[6] As relevant to Lilly's exclusion, the legal prohibitions triggered by a delisting apply only to compounders, not a manufacturer like Lilly.

[7] *See also id.* at 777 (Douglas, J., dissenting) (agreeing with holding); *id.* at 780 (Harlan, J., dissenting) (same).

this Decision"). It announces "a new requirement that is, in effect, a new 'substantive' rule." *Shell Offshore Inc.*, 238 F.36 at 627.

In these respects, the Delisting Action is indistinguishable from the *faux* adjudicatory orders *Safari Club* held to be rules. At issue were two Fish and Wildlife Service "findings" that the agency lacked sufficient information to conclude that sport-hunting of Zimbabwean elephants enhanced the species' survival, triggering an import-ban on trophies. 878 F.3d at 323–24. These findings, the court concluded, "had all of the qualities of a legislative rule." *Id.* at 332. First, they "applied to all potential imports of sport-hunted elephant trophies from Zimbabwe, not to any individual parties." *Id.* Indeed, they "did not adjudicate any dispute between specific parties." *Id.* Second, the resulting import-ban applied only "in future permitting adjudications and enforcement actions" regarding conduct "going forward," with no "retroactive" effect on completed conduct. *Id.* Third, the agency had not "made its findings in the course of" adjudicating a party's rights, but "simply established a standard binding on the agency—a negative enhancement finding and ban on imports—to be applied to future [proceedings], until such time as the Service decides to issue a new rule based on different information." *Id.* at 334. FDA's Delisting Action shares all of these features.

2.    The district court erred in holding otherwise. The court began with error in affording FDA near-insurmountable "discretion" to label its action, ROA.1922, where Circuit precedent holds that "this deference is minimal" and directs courts to "focus" on "the actual characteristics of the agency action,"

*W & T Offshore*, 946 F.3d at 237 (citation omitted). The district court misapplied precedents affording agencies discretion in "the choice between rulemaking and adjudication." *NLRB v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267, 294 (1974); *see* ROA.1922–23. These precedents merely recognize agency discretion for "announcing new principles in an adjudicative proceeding" rather than a rulemaking. *Bell Aerospace*, 416 U.S. at 294; *see also McDonald*, 653 F.2d at 1042. This discretion—where it is available—applies to the agency's choice of *processes* not its *labels*. *W & T Offshore*, 946 F.3d at 237; *Shell Offshore*, 238 F.3d at 627. "[W]hen an agency chooses to issue a rule,… it must follow the procedures indicated in § 553." *Safari Club*, 878 F.3d at 332. "An agency may not escape the requirements of § 553 by labeling its rule an 'adjudication.'" *Id.* The Delisting Action bears all the hallmarks of rulemaking, and FDA merely labeled it an adjudication. The district court was wrong to defer to that choice.

Next, the district court erred in justifying FDA's choice of labels based on features of the statutory shortage scheme it viewed as in tension with the APA's notice-and-comment regime. ROA.1923–25. Those statutory features do not bear on the agency's choice of labels. They instead are properly addressed under the rubric of APA exemptions. As discussed (§ I.A.2, *supra*), statutes do not "supersede or modify" notice-and-comment requirements unless they do so "expressly." 5 U.S.C. § 559. The district court did not apply that standard, much less find it satisfied. Its treatment of the question under its already sweeping

standard of agency discretion was legally erroneous and would, if affirmed, afford agencies near-unfettered discretion to jettison APA requirements.[8]

3.    The district court also erred in its attempt to shoehorn the Delisting Action into the case law on adjudications. *See* ROA.1926–30. It defined adjudication so expansively as to sweep in virtually all final agency action.

As noted, the first defining feature of rulemaking is that it "affects the rights of broad classes of unspecified individuals." *City of Arlington*, 668 F.3d at 242 (quoting *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994)). But the district court deemed this factor categorically irrelevant by holding that the Delisting Action's "broad impact" means nothing. ROA.1926. The district court read qualifying language in *City of Arlington* recognizing the broad impact of some adjudications, *id.* at 243, in a manner that overrides everything *City of Arlington* held about the definition of rulemaking, ROA.1926. In fact, *City of Arlington* merely noted that non-binding cases from the D.C. Circuit approved adjudications by the Federal Communications Commission, but it observed that "even these cases involved concrete and narrow questions of law the resolutions of which would have an immediate and determinable impact on specific factual scenarios." *City of Arlington*, 668 F.3d at 243. Indeed, the D.C. Circuit precedents in question involved agency petitions

---

[8] It is doubtful that Section 503E affords FDA discretion to proceed through adjudication at all, given its listing requirement. An adjudication by FDA would entail an enforcement action against one or more compounders, and FDA would contend in the process, and in hindsight, that the shortage had ended. The statute does not contemplate that.

and rulings adjudicating the rights of specific parties. *See Goodman v. FCC*, 182 F.3d 987, 990–91, 993 (D.C. Cir. 1999); *Qwest Servs. Corp. v. FCC*, 509 F.3d 531, 535 (D.C. Cir. 2007). That does not describe this case. Moreover, in analogizing this case to a "class action," ROA.1926 (citation omitted), the district court identified no manner in which this case is like a class action. None is apparent.

Turning to the second feature of a rulemaking—prospective, rather than retrospective, effect—the district court completely inverted the inquiry. ROA.1927–31. It observed that "the Delisting Action undoubtedly has immediate legal consequences for specific parties," ROA.1929, and reasoned that was unlike a rulemaking, which has "no immediate legal consequences for any specific parties," *Safari Club*, 878 F.3d at 334–35. This reflects semantic confusion. The term "immediate legal consequences" in the context of an adjudication means a determination that past acts did or did not comply with the law: the *Safari Club* decision uses the term to mean "retroactive." 878 F.3d at 334. Properly understood, no immediate legal consequence follows from the Delisting Action because no compounder was fined, penalized, subject to damages, or even declared to act unlawfully for *past* compounding. The "immediate legal consequences" the district court identified took the form of *future* prohibitions on compounding that could no longer occur. ROA.1929–30. But that future application is precisely why the Delisting Action is a rule.

On that point, consider the import of the district court's test. The decision below holds that an adjudication exists regardless of the scope of impact and regardless of whether the impact is prospective or retrospective. Where narrow

26

impact and retrospective application are the two defining features of adjudication, *see Yesler Terrace Cmty. Council*, 37 F.3d at 448, what limiting principle remains? Under the district court's test, every agency could label all of its generally applicable prospective prohibitions "adjudications" exempt from notice-and-comment rulemaking.

### C.    The Delisting Action Must Be Set Aside

In the district court, Defendants argued that the Delisting Action should stand even if notice-and-comment directives apply. Not so.

1.    The district court wrongly accepted Lilly's contention that Plaintiffs' notice-and-comment claim presents a "lose-lose scenario." ROA.1925. The district court mistakenly believed Plaintiffs' position means "the FDA's listing of the Lilly Drugs without notice and comment … is invalid and Plaintiffs should not have been allowed to compound their versions of the drugs." ROA.1925. This was erroneous on many fronts.

First, FDA did not justify the Delisting Action on the grounds that the original listing action was unlawful. "It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 20 (2020) (citation omitted); *see also Louisiana v. United States Dep't of Energy*, 90 F.4th 461, 477 (5th Cir. 2024) ("the agency may not rely on 'impermissible *post hoc* rationalizations' for its actions" (citation omitted)). While agencies may claim prior actions were "illegal," *see Regents*, 591 U.S. at 22, FDA presented no such justification here. The district court's

27

substitution of rationales *post hoc* was the first of its many new justifications missing from the Delisting Action.

Second, even if FDA had reached such a view, it would not negate the APA's dictates. "[I]n rescinding a prior action, an agency cannot simply brand it illegal and move on." *Louisiana v. DOE*, 90 F.4th at 475. Because "deciding how best to address a finding of illegality moving forward can involve important policy choices," *id.* (citation omitted), an agency that makes a determination of prior illegality must evaluate obvious alternatives to simple rescission. In *Regents*, the Department of Homeland Security properly determined that its prior action was unlawful, but that did not exempt DHS from the APA's requirements in rescinding that action. *Id.* at 14–33. Here, FDA would be required to evaluate alternatives to rescinding the shortage decision, such as justifying the listing action under the "good cause" exception to notice-and-comment rulemaking, 5 U.S.C. § 533(d)(3), or reissued under different procedures, *see Regents*, 591 U.S. at 27. FDA did none of that work, and the district court erred in doing the agency's work for it.

Third, the APA directs that the process "required" to promulgate a rule be used to rescind it, not that whatever the agency did at the outset necessarily applies to amendments or repeal. *Perez*, 575 U.S. at 101. The district court's view that two APA wrongs make a right, if accepted, would leave agencies free to disregard numerous longstanding rules. For example, the Internal Revenue Service eschewed notice-and-comment rulemaking for years, accounting for a meaningful portion of tax regulations that—as the district court's reasoning

28

would have it—can be withdrawn by the agency at will, without any APA process. Kristin Hickman, It's Time To Let Go: Treasury Regulations Are Not Interpretative Rules, Tax Notes (June 16, 2022). Meanwhile, other agencies employed notice-and-comment rulemaking where it was not required. *See generally* Nicholas Parillo, Should the Public Get to Participate Before Federal Agencies Issue Guidance?, 71 Admin. L. Rev. 57 (2019). The district court's ruling would mean these actions may only be undone through notice-and-comment rulemaking, even though that was unnecessary to their promulgation. That is simply wrong.

2.    Defendants also argued that the Delisting Action can stand despite the APA violation under a harmless-error theory. But circuit precedent holds that "[s]ubstantive rules not subjected to notice and comment may not be enforced against a party." *W & T Offshore*, 946 F.3d at 237. That is dispositive.

To the extent it matters, FDA's failure prejudiced Plaintiffs. First, the agency never provided notice to the public, even as it considered a matter implicating supply, demand, and availability across the entire nation. While some parties like Plaintiffs were aware of FDA's consideration, not all patients, providers, insurers, telehealth operators, pharmacy chains, etc., with pertinent information regularly visit "FDA's website," ROA.1922—or, to be precise, an

obscure page buried on its website.[9] That matters because most public evidence of a shortage is additive: more reports of unavailability, across more places, showing consistency or growth over time carry greater weight. Those who were able to provide evidence are prejudiced by the agency's refusal to provide notice to and solicit information from everyone else.

Second, without notice, members of the public had no way of knowing what kinds of information the agency would consider and no ability to address the agency's illogical restrictions on the information deemed fit for consideration. The prejudice in this is plain: ████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████ FDA's failure to do so violated its "obligation to make its views known to the public in a concrete and focused form

---

[9] *See* FDA, FDA clarifies policies for compounders as national GLP-1 supply begins to stabilize (Dec. 19, 2024), *available at* https://www.fda.gov/drugs/drug-safety-and-availability/fda-clarifies-policies-compounders-national-glp-1-supply-begins-stabilize

so as to make criticism or formulation of alternatives possible." *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 36 (D.C. Cir. 1977).

## II. The Delisting Action Is Arbitrary and Without a Reasoned Basis

FDA also violated the APA by resolving the shortage without coherent findings, a sufficient factual basis, or a proper implementation of the statutory directive. "[I]n order to permit meaningful judicial review, an agency must 'disclose the basis" of its action.'" *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019) (citation omitted). Courts, in turn, "must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). Review under this standard of "the factual basis for an agency's conclusions … is functionally the same as the 'substantial evidence' test used to evaluate formal agency action under 5 U.S.C. § 706(2)(E)." *Amin v. Mayorkas*, 24 F.4th 383, 393 (5th Cir. 2022). Agency decision-making fails this standard if it "fails to account for 'relevant factors' or evinces 'a clear error of judgment,'" *Univ. of Texas M.D. Anderson Cancer Ctr.*, 985 F.3d at 475 (citation omitted), such as where it is "[i]llogic[al] and internally inconsistent," *Chamber of Com. of United States of Am. v. United States Dep't of Lab.*, 885 F.3d 360, 382 (5th Cir. 2018); *see also Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1016 (5th Cir. 2019) (same).

The Delisting Action falls far short. FDA stated that it was analyzing whether there exists "a period of time when the demand or projected demand for" injection tirzepatide "within the United States exceeds the supply of the

31

drug." ROA.3967 (quoting 21 U.S.C. § 356c(h)(2)). ███████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

That is not reasoned decision-making, and the district court's *post hoc* justifications cannot save the Delisting Action.

███ ████████████████████████████████

1. ████████████████████████████████████

████████████████████████████ ROA.3967 (quoting 21 U.S.C. § 356c(h)(2)). Whatever the scope of FDA's discretion in selecting a time period, the Supreme Court has "frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner." *State Farm*, 463 U.S. at 48. ████████████████████████████████

███████████████████████████████████████████

███████

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████ For example, a loan applicant can take a bank account snapshot showing a $50,000 surplus on one day, right before a credit-card payment the next day draws the balance down to zero. That is why, when evaluating shortage status, ███████████████████████████████

32

████████████████████████████████████████

███████████████████████████████████████

    ████████████████████████████████

████████████████████████████████████████

████████████████████████████████. This alone requires

vacatur.

    2.    ██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

    ██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████ an accounting of inventory for a monthly period should contain at a minimum: (1) beginning inventory, (2) purchases during the month, and (3) ending inventory. *See* Penn State University, Financial and Managerial Accounting, 2.6 Accounting for Inventory.[10] ██████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

---

[10] *Available at* https://psu.pb.unizin.org/acctg211/chapter/periodic-v-perpetual-inventory/

███████████████████████████████████████
██████████████████████

3.   ████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

This type of omission dooms agency action. *State Farm*, 463 U.S. at 50; *Regents*, 591 U.S. at 27–30; *Louisiana v. DOE*, 90 F.4th at 473; *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1226–27 (5th Cir. 1991), *opinion clarified* (Nov. 15, 1991). For example, this Court rejected the Department of Energy's repeal of conservation standards where "several alternatives" were available "but DOE ignored all of them," failing to explain why its ultimate choice beat out other possibilities. *Louisiana v. DOE*, 90 F.4th at 473. And the D.C. Circuit vacated flight restrictions by the Federal Aviation Administration over the Grand Canyon to achieve "natural quiet" measured by "the average annual day" because the agency did not explain why it chose that measure over an "any given day" measure. *U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997, 1015–18 (D.C. Cir. 2002); *see also Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 203–06 (D.C. Cir. 2007) (rejecting regulations governing commercial driving hours because they were based on a

36

model that used an aggregate measure inconsistently, plotted the aggregate figure in an unjustified manner, divided the crash risk estimate by an average risk estimate, and ignored the potential factor of cumulative fatigue—all without explanation); *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1143 (9th Cir. 2015) (rejecting EPA decision that left the "reader wondering what metric, if any, EPA used to determine" best available retrofit technology, "or if EPA employed no metric, why not"). ████████████████████

████████████████████████████████████████

████████████

   ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

Beyond the district court's error in providing "*post hoc* rationalization[s]," *Louisiana v. DOE*, 90 F.4th at 469, that observation only begs, and does not answer, the question ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

   ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████, it was obliged to explain that and

also why readily apparent "alternative[s]" were rejected. *State Farm*, 463 U.S. at

50. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

     4.     The district court effectively excused FDA from any requirement of

reasoned decision-making. It distinguished cases applying the reasoned

decision-making standard on the ground that "FDA properly proceeded through

adjudication" and concluded that "the general proposition that agencies are

required to explain their rejection of reasonable alternatives that were proposed

during the comment period[] is inapplicable here." ROA.4669. This is incorrect,

even assuming for the sake of argument that FDA properly labeled its

rulemaking an adjudication. *But see supra* Argument § I. "[A]djudication is

subject to the requirement of reasoned decisionmaking as well," *Allentown Mack*

*Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998), which—as FDA knows—is "the same standard of reasonableness as [governs] notice and comment rulemaking," *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1140 (5th Cir. 2021) (citation omitted); *see also New England Health Care Emps. Union v. NLRB*, 448 F.3d 189, 195 (2d Cir. 2006); *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 688 (9th Cir. 2007); *SKF USA Inc. v. United States*, 630 F.3d 1365, 1374 (Fed. Cir. 2011).

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████ That is simply to hold that the agency's choice is justified because the agency made it. But even where an agency must select a metric that "is 'necessarily a somewhat arbitrary figure,'" it must nonetheless "'provide substantial evidence to support its choice and respond to substantial criticisms of that figure.'" *Process Gas Consumers Grp. v. FERC*, 177 F.3d 995, 1003 (D.C. Cir. 1999) (quoting *United Distrib. Cos. v. FERC*, 88 F.3d 1105, 1141 n.45 (D.C. Cir. 1996)) (alteration marks omitted); *see also Ass'n of Priv. Colleges & Univs. v. Duncan*, 870 F.Supp.2d 133, 153 (D.D.C. 2012).

████████████████████████████████████████ it would conflict with the requirement that the shortage list be "up-to-date." 21 U.S.C. § 356e(a). FDA acknowledges the weight of the directive when it finds doing so suitable: this is the agency's *principal* basis for evading notice-and-comment rulemaking. ███████████████████████████████

███████████████████████████████████████████████████

███████. The term "up-to-date" means "using or including the latest facts," "keeping up with what is more recent in … information." Webster's New World College Dictionary 1571 (4th ed. 2007). ████████████████████████ ████████████████████████████████████████████ Under this approach, it is possible that tirzepatide could never be in shortage, ██████████████████ ████████████████████████████████████████████ ████████████████████████

███ ████████████████████████████████████ ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████

    1.   ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ █ ██████

████████████████████████████████████████████

████████████████████████████████████████████

---



This same type of adjustment defeats the district court's *post hoc* carryover

rationalization. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

    2.   ██████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

13 ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

    ██████████████████████ ██████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

    ███████████████████████████████████████

███████████████████████████████████████████ FDA

never noticed.

---

[14] ███████████████████████████████████████████████
███████████████████████████████████████

█ ████████████████████████████████████
██████████████████████████

████████████████████████████████████

████████████████████████████████████ To analyze whether there is "a period of time when the demand or projected demand for" injection tirzepatide "within the United States exceeds the supply of the drug," ROA.3967 (quoting 21 U.S.C. § 356c(h)(2)), requires comparing supply with demand. ███████████████████████

████████████████████████████████████████

██████

████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

███████████████████████████

█████████████████████████████████

███████████████████████████████████

██████████ ████████ That exhibits willful blindness. ██████ █

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████ *Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*, 942 F.3d 1154, 1157

(D.C. Cir. 2019) (action is arbitrary if it "is mathematically false").

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████

    ███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

    ██   █████████████████████████████████████

         █████████████████████████████████

    ███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████, FDA "treated conflicting evidence here with an almost breathtaking lack of evenhandedness." *Sutter E. Bay Hosps. v. NLRB*, 687 F.3d 424, 437 (D.C. Cir. 2012). █████████████████████████████████████████████████████████████████ one doubts any showing could satisfy the agency.

———————————————

██   █████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████

1. ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████[16]

        ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[16] *See* Russ Britt, MarketWatch, 'Big Three' pharma distributors post sharp gain (Sept. 15, 2010), https://www.marketwatch.com/story/big-3-pharma-distributors-post-sharp-gains-2010-09-15.

[17] ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████

      ████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████ FDA applied a statute defining shortage as "a period of time when the demand or projected demand for the drug *within* the United States exceeds the supply of the drug," 21 U.S.C. § 356c(h)(2) (emphasis added), and "within" means "inside the limits of," Webster's New World College Dictionary 1571 (4th ed. 2007), not coextensive with those limits. FDA's suggestion that patients' inability to obtain product was a merely regional problem was arbitrary and unlawful.

    2.   ██████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

██████████████████ This basis fails for reasons stated above (§ II.A).

      ████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

3.



4. FDA erred in disregarding the "the sales volume of compounded tirzepatide" as evidence of demand. ROA.3986. As an initial matter, FDA acted arbitrarily in considering compounded tirzepatide only in evaluating projected demand but not current demand, reasoning that "[t]he relevant demand here is the demand for the approved drug product, and *not* the demand for a different drug, i.e., demand for a compounded tirzepatide drug." ROA.3986–87. The statute does not define projected demand differently from existing demand. And, either way, FDA's position is the product of legal error. The compounding authorized during shortages is for drugs that are "essentially a copy" of approved drugs. 21 U.S.C. § 353b(a)(5); *see also id.* § 353a(b)(1)(D). The statute does not treat a compounded form as "a different drug" but as functionally the same drug. ROA.3986. Moreover, FDA's reading is at war with the statutory scheme. Essentially-a-copy compounding is allowed during shortages to enable compounded drugs to fill the demand the manufacture is not satisfying. To redefine that same demand as not part of the demand would redefine shortages out of existence as soon as they are declared.

FDA also erred in evaluating projected demand. ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████    This announces in startling terms that, insofar as FDA is concerned, the way to end a shortage is to declare that only rich Americans may access GLP-1 products. That rule of law would enable Lilly to end shortages simply by raising prices or limiting supply (or both). Because supply and demand always meet at price, this approach redefines demand as coterminous with Lilly's supply. This would defeat the purpose of a supply-demand inquiry.

## CONCLUSION

The Court should reverse the district court's judgment and direct vacatur of the Delisting Action and remand to FDA.

Dated: July 30, 2025                    Respectfully submitted,

                                        /s/ Andrew M. Grossman

TY DOYLE                                ANDREW M. GROSSMAN
BAKER & HOSTETLER LLP                   RICHARD B. RAILE
811 Main Street, Suite 1100            KRISTIN A. SHAPIRO
Houston, TX 77002                      MARC N. WAGNER
(713) 646-1374                         BENJAMIN D. JANACEK
tgdoyle@bakerlaw.com                   BAKER & HOSTETLER LLP
                                        Washington Square, Suite 1100
                                        1050 Connecticut Ave., N.W.
                                        Washington, D.C. 20036
                                        (202) 861-1697
                                        agrossman@bakerlaw.com

                                        *Attorneys for Plaintiffs–Appellants*

## CERTIFICATE OF SERVICE

I certify that on August 21, 2025, I filed the foregoing with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.

Dated: August 21, 2025

*/s/ Andrew M. Grossman*
Andrew M. Grossman
Baker & Hostetler LLP
1050 Connecticut Ave., N.W.,
Suite 1100
Washington, D.C. 20036
(202) 861-1697
agrossman@bakerlaw.com

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and 5th Cir. R. 32.3, I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) and 5th Cir. R. 32.2 because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 12,756 words.

Pursuant to Fed. R. App. P. 32(g) and 5th Cir. R. 32.3, I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Calisto MT font.

Dated: July 30, 2025

*/s/ Andrew M. Grossman*
Andrew M. Grossman
Baker & Hostetler LLP
1050 Connecticut Ave., N.W.,
Suite 1100
Washington, D.C. 20036
(202) 861-1697
agrossman@bakerlaw.com