**No. 25-10600**

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————————

OUTSOURCING FACILITIES ASSOCIATION;
NORTH AMERICAN CUSTOM LABORATORIES, L.L.C. PARTNERS,
DOING BUSINESS AS FARMAKEIO CUSTOM COMPOUNDING,

*Plaintiffs-Appellants*,

v.

FOOD & DRUG ADMINISTRATION;
DR. MARTY MAKARY, COMMISSIONER, U.S. FOOD AND DRUG ADMINISTRATION,

*Defendants-Appellees*,

v.

ELI LILLY AND COMPANY,

*Intervenor-Appellee.*

———————————

On Appeal from the United States District Court
for the Northern District of Texas,
No. 4:24-cv-953

———————————

### INTERVENOR-APPELLEE'S RESPONSE BRIEF
———————————

JAMES F. HURST, P.C.
DIANA M. WATRAL, P.C.
RYAN MOORMAN, P.C.
JAMES R.P. HILEMAN
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654

ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN
KYLE R. EISWALD
CLEMENT & MURPHY, PLLC
706 Duke Steet
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Intervenor-Appellee*

November 19, 2025

## CERTIFICATE OF INTERESTED PERSONS

This appeal has been docketed in this Court as No. 25-10600 (5th Cir.) and is on appeal from the United States District Court for the Northern District of Texas's grant of summary judgment in favor of Defendants-Appellees and Intervenor-Appellee in No. 4:24-cv-953 (N.D. Tex.).

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Further, pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel of record certifies that there are no corporations that are parents of Intervenor-Appellee or that own stock in Intervenor-Appellee.

**A.　Intervenor-Appellee**

Eli Lilly and Company

**B.　Attorneys for Intervenor-Appellee Eli Lilly and Company**

Paul D. Clement
Erin E. Murphy
Matthew D. Rowen
Kyle R. Eiswald
CLEMENT & MURPHY PLLC
706 Duke Street
Alexandria, VA 22314

i

Dee J. Kelly, Jr.
KELLY HART & HALLMAN
201 Main Street, Suite 2500
Fort Worth, TX 76102


James F. Hurst
Ryan J. Moorman
Diana M. Watral
James R. P. Hileman
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654

Jay P. Lefkowitz
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022


## C.    Plaintiffs-Appellants

Outsourcing Facilities Association

North American Custom Laboratories LLC Partners d/b/a FarmaKeio Custom
Compounding


## D.    Attorneys for Plaintiffs-Appellants

Tyler Geoffrey Doyle
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, TX 77002

Andrew Michael Grossman
Richard Bryan Raile
Kristin Shapiro
Marc N. Wagner
Benjamin D. Janacek

Renee Knudsen
BAKER & HOSTETLER LLP
1050 Connecticut Avenue N.W., Suite 1100
Washington, D.C. 20036


Jeremy B. Kustoff
BAKER & HOSTETLER LLP
2850 North Harwood, Suite 1100
Dallas, TX 75201

Brian Burgess
GOODWIN PROCTER LLP
1900 N Street N.W.
Washington, D.C. 20036


**E.　　Defendants-Appellees**

United States Food and Drug Administration

Martin A. Makary, M.D., M.P.H.


**F.　　Attorneys for Defendants-Appellees**

Caroline W. Tan
DOJ CIVIL DIVISION
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530

Kimberly Ruthsatz Stephens
DOJ CIVIL DIVISION
450 5th Street N.W., Suite 6400
Washington, D.C. 20001

Oliver McDonald
DOJ CIVIL DIVISION, CONSUMER PROTECTION BRANCH
450 5th Street N.W., Room 6400-South

Washington, D.C. 20530

David Hixson
DOJ CIVIL DIVISION
PO Box 386
Washington, D.C. 20044

Daniel Bentele Hahs Tenny, Esq.
DOJ CIVIL DIVISION
1100 L Street N.W.
Washington, D.C. 20530

## G.     Movant Strive Specialties, Inc.

Strive Specialties, Inc.

## H.     Attorneys for Movant

Mark Boesen
BOESEN AND SNOW LLC
8501 E. Princess Drive, Suite 220
Scottsdale, AZ 85255

Derek S. Davis
COOPER & SCULLY PC
900 Jackson, Suite 100
Dallas, TX 75202

## I.     **Amici**

Ivim Health

Novo Nordisk Inc.

## J.     Attorneys for Amicus Ivim Health

Michael E. Hassett

HARRISON STECK, P.C.
515 Houston Street, Suite 701
Fort Worth, TX 76102


Brian Burgess
GOODWIN PROCTER LLP
1900 N Street N.W.
Washington, D.C. 20036


**K.     Attorneys for Amicus Novo Nordisk Inc.**

Benjamin C. Block
Daniel G. Randolph
Thomas Ross Brugato
COVINGTON & BURLING LLP
One City Center
850 10th Street N.W.
Washington, D.C. 20001

Trevor William Carolan
BOWMAN AND BROOKE LLP
5850 Granite Parkway, Suite 900
Plano, TX 75024


**L.     Interested Third Parties**

Southwest Home Solutions LLC

FarmaKeio AR LLC

FarmaKeio Outsourcing LLC

Evexias Holding Co LLC

Sutherland Solutions LLC

JL Graves Holdings LLC

JWRD Holdings LLC

Harris Portal Solutions LLC

Nilus LLC

Daniel DeNeui

Michael Cole

Justin Graves

Cody Boatman

Robert Harris

Paul Jowell

s/Erin E. Murphy
Erin E. Murphy
 *Counsel of Record*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Intervenor-Appellee*

vi

## STATEMENT REGARDING ORAL ARGUMENT

Although the decision below is plainly correct and could be affirmed on the papers, Intervenor-Appellee does not object to Appellants' request for oral argument, should this Court wish to grant it.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS...................................................... i

STATEMENT REGARDING ORAL ARGUMENT............................................... vii

TABLE OF AUTHORITIES.................................................................. ix

INTRODUCTION ....................................................................... 1

STATEMENT OF THE ISSUES ........................................................... 3

STATEMENT OF THE CASE............................................................. 3

    A.    Regulatory and Factual Background ......................................... 3

    B.    Procedural History......................................................... 10

SUMMARY OF ARGUMENT............................................................ 23

STANDARD OF REVIEW ............................................................. 25

ARGUMENT ......................................................................... 26

I.    Plaintiffs Received All The Process They Were Due (And Then Some)................................................................. 26

    A.    FDA Properly Proceeded Via Informal Adjudication ........................ 26

    B.    Plaintiffs Suffered No Prejudice In All Events ................................ 34

II.    FDA's Determination Was Well-Reasoned And Reasonable ....................... 37

    A.    FDA Properly Identified Key Parameters and Made the Requisite Findings........................................................ 37

    B.    FDA's Analysis of and Reliance on Lilly's Comprehensive Data Was Reasonable and Reasonably Explained ........................... 43

    C.    FDA Considered Plaintiffs' Submissions and Reasonably Found Them Unreliable and/or Not Particularly Probative .............. 47

CONCLUSION ....................................................................... 57

# TABLE OF AUTHORITIES

## Cases

*Am. Airlines v. DOT*,
202 F.3d 788 (5th Cir. 2000)..................................................................34

*Anne Arundel Cnty. v. EPA*,
963 F.2d 412 (D.C. Cir. 1992) ...............................................................31

*Athenex Inc. v. Azar*,
397 F.Supp.3d 56 (D.D.C. 2019) ..............................................................7

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
419 U.S. 281 (1974)...............................................................................26

*City of Arlington v. FCC*,
668 F.3d 229 (5th Cir. 2012)........................................................ *passim*

*Ctr. for Bio. Diversity v. Everson*,
435 F.Supp.3d 69 (D.D.C. 2020) ...........................................................30

*Delta Found. v. United States*,
303 F.3d 551 (5th Cir. 2002)..................................................................53

*FDA v. Wages & White Lion Invs., L.L.C.*,
604 U.S. 542 (2025) ................................................................. 26, 30, 36

*Green Rock v. IRS*,
104 F.4th 220 (11th Cir. 2024)..............................................................30

*Hayward v. U.S. Dep't of Lab.*,
536 F.3d 376 (5th Cir. 2008)......................................................... 26, 39

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995)..................................................................30

*Joseph v. Dir. of Tx. Serv. Ctr.*,
2025 WL 458001 (5th Cir. Feb. 11, 2025)..............................................26

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020).................................................................. 34, 35, 36

*Mann Constr. v. United States*,
27 F.4th 1138 (6th Cir. 2022)........................................................30

*Med. Ctr. Pharmacy v. Mukasey*,
536 F.3d 383 (5th Cir. 2008)...........................................................6

*Mock v. Garland*,
75 F.4th 563 (5th Cir. 2023)..........................................................28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983)......................................................... 24, 26, 40

*Nat'l Ass'n of Farmworkers Org. v. Marshall*,
628 F.2d 604 (D.C. Cir. 1980) .......................................................32

*Neustar v. FCC*,
857 F.3d 886 (D.C. Cir. 2017) .......................................................27

*NRDC v. Wheeler*,
955 F.3d 68 (D.C. Cir. 2020) ........................................................30

*Perez v. Mortgage Bankers Ass'n*,
575 U.S. 92 (2015)................................................................. 28, 33

*Phoenix Herpetological Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*,
998 F.3d 999 (D.C. Cir. 2021) .......................................................40

*Safari Club Int'l v. Zinke*,
878 F.3d 316 (D.C. Cir. 2017) .......................................................31

*Shell Offshore Inc. v. Babbitt*,
238 F.3d 622 (5th Cir. 2001)............................................... 23, 25, 27

*Texas v. EPA*,
137 F.4th 353 (5th Cir. 2025)........................................................53

*United States v. Cadden*,
965 F.3d 1 (1st Cir. 2020) ..............................................................8

*United States v. Fla. E. Coast Ry. Co.*,
410 U.S. 224 (1973)............................................................... 23, 26

x

*United States v. Garner*,
  767 F.2d 104 (5th Cir. 1985)................................................................26

*United States v. Johnson*,
  632 F.3d 912 (5th Cir. 2011)...............................................................34

*W & T Offshore v. Bernhardt*,
  946 F.3d 227 (5th Cir. 2019)...............................................................36

*Weinberger v. Hynson, Westcott & Dunning*,
  412 U.S. 609 (1973).............................................................................29

**Statutes**

5 U.S.C. §553(b) ....................................................................................35

5 U.S.C. §706 ........................................................................................34

21 U.S.C. §321(n) ....................................................................................3

21 U.S.C. §351(a)(2) ................................................................................3

21 U.S.C. §352(a)(1) ................................................................................3

21 U.S.C. §352(f)(1) .................................................................................3

21 U.S.C. §352(f)(2) .................................................................................3

21 U.S.C. §352(n) .....................................................................................3

21 U.S.C. §353a(a)................................................................................5, 6

21 U.S.C. §353a(b)(1)...............................................................................6

21 U.S.C. §353b(a)(1)...............................................................................7

21 U.S.C. §353b(a)(2)..................................................................... 7, 28, 31

21 U.S.C. §353b(a)(5).......................................................................... 7, 28

21 U.S.C. §353b(b)(1)...............................................................................7

21 U.S.C. §353b(d)(2).......................................................................... 7, 28

21 U.S.C. §355(b)(1)..................................................................................3

21 U.S.C. §355(c)(3)................................................................................4

21 U.S.C. §355(d) ..................................................................................29

21 U.S.C. §355(e) ..................................................................................29

21 U.S.C. §355(f)...................................................................................29

21 U.S.C. §355(g)..................................................................................29

21 U.S.C. §355(j)(5) ...............................................................................4

21 U.S.C. §355(k)...................................................................................3

21 U.S.C. §355(o)...................................................................................3

21 U.S.C. §356c(h)(2)................................................................. 7, 40, 41

21 U.S.C. §356e(a)............................................................... 5, 29, 35, 41

21 U.S.C. §356e(b)(1)............................................................................29

21 U.S.C. §356e(b)(2)............................................................................29

21 U.S.C. §356e(c)(3).............................................................................30

21 U.S.C. §360eee-1 ...............................................................................3

Pub. L. No. 106-387 §745(b)(5), 114 Stat. 1549 (2000) .......................... 3

**Rule**

21 C.F.R. §314.81(b)(3) ...........................................................................8

**Other Authorities**

Alice Park, *Medicare Will Not Cover GLP-1 Drugs for Weight Loss*, Time
    (Apr. 7, 2025), https://perma.cc/FKJ6-2R4K .....................................54

Am. Diabetes Ass'n, *The American Diabetes Association Announces
    Statement on Compounded Incretin Products* (Dec. 2, 2024),
    https://perma.cc/752H-XQG3 ...........................................................10

Charlotte Huffman & Mark Smith, *Dozens say they lost eyesight after routine surgery using compounded pharmacy drugs*, WFAA, https://perma.cc/X3E4-6RRA ...................................................................8

Dep't of Health and Aged Care, *Protecting Australians from unsafe compounding of replica weight loss products* (May 22, 2024), https://perma.cc/G4PW-JRLW ...............................................................9

James Watson et al., *Pharmaceutical Compounding: a History, Regulatory Overview, and Systematic Review of Compounding Errors*, 17(2) J. Med. Toxicology 197 (2020), https://perma.cc/TUM8-ZUAA...............6

Letter from Shannon Glueck, Pharm.D., U.S. Food & Drug Admin., to Philip Dickison, PhD, RN, Nat'l Council of State Bds. of Nursing (July 16, 2024), https://perma.cc/5SAG-BRBX...................................................9

Nat'l Ass'n of Attys' Gen., *State and Territory Attorneys General Urge FDA to Take Action Against Counterfeit and Illegally Sold GLP-1 Drugs* (Feb. 19, 2025), https://perma.cc/2SVU-YX2V.......................................9

Nat'l Consumers League, *NCL urges the public to heed warnings about unregulated versions of GLP-1 weight loss drugs* (Feb. 4, 2025), https://perma.cc/8NNE-7Z5G...................................................................9

Ned Pagliarulo, *Zepbound, Mounjaro back in supply as Lilly resolves shortage*, BioPharma Dive (Aug. 5, 2024), https://perma.cc/EK2C-9NMC ...............................................................10

Pew Charitable Trusts, *U.S. Illnesses and Deaths Associated With Compounded or Repackaged Medications, 2001-19* (Mar. 2, 2020), https://perma.cc/H48G-4378.................................................................8

U.S. Food & Drug Admin., *FDA clarifies policies for compounders as national GLP-1 supply begins to stabilize* (Oct. 2, 2024), https://perma.cc/SBF8-TZJU.................................................................11

U.S. Food & Drug Admin., *FDA's Concerns with Unapproved GLP-1 Drugs Used For Weight Loss* (Mar. 17, 2025), https://perma.cc/XU63-AYRH.................................................................9

## INTRODUCTION

Eli Lilly and Company ("Lilly") spent years and billions of dollars working to secure FDA approval for Mounjaro® and Zepbound®, groundbreaking medicines containing tirzepatide, a macromolecule Lilly discovered.  Both medicines meet critical patient needs:  Mounjaro® treats type-2 diabetes; Zepbound® treats chronic weight management and sleep apnea.  Both medicines thus faced unprecedented demand when they came on the market, which led FDA to place them on its statutorily mandated "drug shortage" list.  That, in turn, led a cast of so-called "compounders" to begin mass-manufacturing and mass-marketing their own untested knockoffs of Lilly's medicines.  Fortunately, the shortage has been over for a long time now.  As a result of an historic investment in manufacturing capacity, and especially domestic manufacturing capacity, Lilly has been able to meet demand for Mounjaro® and Zepbound® across all available dosages since at least August 2024, and it will be able to do so going forward.  FDA accordingly determined in October 2024 that the temporary shortage had resolved.

"That 'delisting' ended the ability of compounders to produce tirzepatide medications," Order 2, CA5.No.25-10385, Dkt.98-1, so it came as little surprise when a compounder and a trade association ("Plaintiffs") challenged it under the Administrative Procedure Act ("APA"), arguing principally that FDA needed to do a deeper dive into whether the shortage was over.  FDA responded to Plaintiffs' suit

by volunteering to take another look and consider any additional evidence that Plaintiffs (or anyone else) wanted to provide. FDA then exhaustively "considered potentially relevant information … from patients, healthcare providers, and others, including compounders," as well as "detailed information and data" from Lilly about supply and demand ███████████████████████. ROA.1739-40. Based on all that information, FDA concluded on December 19, 2024, that its October 2024 decision was correct: The shortage was indeed resolved, and the unscientific and anecdotal evidence Plaintiffs submitted did "not undermine or outweigh the evidence demonstrating that Lilly's supply is currently meeting or exceeding demand" and would continue to do so going forward. ROA.1740.

Plaintiffs predictably attacked FDA's reified decision, raising essentially the same complaints as before. But as the district court correctly concluded after studying the record in detail, Plaintiffs' arguments are meritless. Whether Lilly's supply meets demand for its medicines is a classic factual question appropriately answered through an adjudication, not formal notice-and-comment rulemaking— although FDA provided Plaintiffs with notice and the opportunity to comment anyway, which they did in force. And FDA's determination that the shortage had ended is reasonable, reasonably explained, and amply supported by the evidence. This Court should affirm.

2

**STATEMENT OF THE ISSUES**

1. Whether the district court correctly concluded that FDA can engage in informal adjudication to determine whether a drug is in shortage.

2. Whether the district court correctly concluded that FDA's determination that the tirzepatide shortage had resolved was not arbitrary and capricious.

**STATEMENT OF THE CASE**

### A.    Regulatory and Factual Background

1. Pharmaceutical manufacturers must secure FDA approval to market new medicines—and FDA approval is "the gold standard for safety and effectiveness" for a reason.  Pub. L. No. 106-387 §745(b)(5), 114 Stat. 1549, 1549A-36 (2000). Before a new medicine can win FDA's approval, it must be evaluated through three increasingly complex phases of studies, and the sponsor must detail every ingredient and component in its application.  21 U.S.C. §355(b)(1)(A)(i)-(viii).  FDA conducts manufacturing inspections to ensure compliance with "current good manufacturing practice" ("cGMP"), *id.* §351(a)(2)(B), and reviews the drug's labeling to ensure appropriate disclosure of side effects, warnings, and contraindications, *id.* §352(f)(1)-(2).  Post-approval, FDA monitors advertising and promotion to ensure it is not misleading, *id.* §§321(n), 352(a)(1), 352(n), and also requires manufacturers to track and trace finished products, *see, e.g., id.* §360eee-1, promptly report any adverse events, *id.* §355(k), and conduct still more studies, *id.* §355(o).

3

Because FDA approval is so difficult to secure, Congress has incentivized costly investment in innovative medicines by granting statutory exclusivities (distinct from intellectual-property rights) that allow innovators to be the only lawful source of a medicine, like tirzepatide, for a period of time. Relevant here, new-chemical-entity exclusivity is earned whenever FDA approves a new medicine for the first time. 21 U.S.C. §355(c)(3)(E)(ii), (j)(5)(F)(ii).

2. Throughout its nearly 150-year existence, Lilly has pioneered countless life-changing discoveries and developed more than 100 medicines across some of the most challenging diseases. One of Lilly's recent achievements has been its discovery of tirzepatide, a complex macromolecule that targets two hormone receptors. Over the course of nearly a decade, Lilly completed 37 pre-clinical studies and clinical trials of tirzepatide, which ultimately resulted in two FDA-approved medicines: Mounjaro®, approved in 2022 to treat adults with type-2 diabetes; and Zepbound®, approved in 2023 to help adults with chronic weight management and then again in 2024 to treat moderate-to-severe obstructive sleep apnea in adults with obesity.[1]

---

[1] Mounjaro® and Zepbound® are "GLP-1/GIP receptor agonists." These medicines are sometimes grouped together colloquially with other injectable medicines as "GLP-1 receptor agonists" or "incretins."

Mounjaro® and Zepbound® each come in six dosage strengths, with patients typically starting at the lowest strength and titrating up to higher strengths over time as needed. And each medicine has been commercially available since its launch. *See, e.g.*, ROA.1745, ROA.1748 ████████████████████████████ ████████████████████████████████████ But, for a time after Mounjaro® and Zepbound® first came on the market, Lilly experienced greater demand than it could accommodate, reflecting the medicines' immense value to patients and healthcare providers. After Lilly informed FDA that it projected excess demand, the agency placed Mounjaro® and later Zepbound® on its statutorily mandated drug-shortage list in December 2022 and April 2024, respectively. *See* 21 U.S.C. §356e(a) (requiring FDA to "maintain an up-to-date list of drugs … in shortage").

3. In response to FDA's shortage determinations, many entities saw an opportunity to make quick profits by mass-producing untested and potentially unsafe compounded versions of Lilly's blockbuster tirzepatide products.

"Compounding" means mixing ingredients together to create a drug product without the presumptively mandatory FDA review and pre-approval. Today, Congress permits compounding only in narrow circumstances. Licensed pharmacists and physicians may compound a drug in response to a prescription identifying a real need for that drug. *See* 21 U.S.C. §353a(a). (Because 21 U.S.C.

5

§353a is Section 503A of the Federal Food Drug and Cosmetics Act ("FDCA"), those pharmacists and physicians who compound under its auspices are colloquially called "503A compounders.") This limited allowance for compounding may be salutary in small doses; for instance, a person allergic to gelatin (and thus gelcaps) might require a drug that usually comes only in gelcaps to be compounded for her. *See* C. James Watson et al., *Pharmaceutical Compounding: a History, Regulatory Overview, and Systematic Review of Compounding Errors*, 17(2) J. Med. Toxicology 197, 198 (2020), https://perma.cc/TUM8-ZUAA ("Patients may be allergic to binding agents … or other inactive ingredients in commercially available formulations.").

But this limited permission for medically necessary compounding is not an excuse to mass-produce knockoffs free from FDA oversight. Congress accordingly imposed a series of requirements to ensure that 503As are "engaged in traditional compounding rather than disguised manufacturing." *Med. Ctr. Pharmacy v. Mukasey*, 536 F.3d 383, 391 (5th Cir. 2008). One such restriction is that 503As may not "compound regularly or in inordinate amounts … drug products that are essentially copies of a commercially available drug product." 21 U.S.C. §353a(b)(1)(D). This limitation is crucial to patient safety because 503As do not have to register with FDA, comply with cGMP, or follow ordinary drug-labeling rules. *See id.* §353a(a).

6

Congress separately authorized compounding by "outsourcing facilities" (or "503Bs"), which are compounders that have voluntarily registered with FDA. *See id.* §353b(a)(1), (b)(1)(A). As the name implies, outsourcing facilities are intended to consolidate pharmacy operations that would otherwise occur at individual healthcare facilities. Unlike ordinary pharmacies, outsourcing facilities must register with FDA, disclose their drugs to FDA, comply with cGMP, and report some adverse events to FDA. Still, drugs compounded by outsourcing facilities, like all compounded drugs, are not tested in clinical trials, are not approved (or even reviewed) by FDA, and are not required to comply with a host of other critical drug-safety requirements. Accordingly, Congress requires outsourcing facilities to comply with "eleven statutory criteria" designed to ensure that they do not become large-scale, off-book drug manufacturers. *Athenex Inc. v. Azar*, 397 F.Supp.3d 56, 59 (D.D.C. 2019). Relevant here, outsourcing facilities usually may not compound any drug that is "essentially a copy of one or more approved drugs." 21 U.S.C. §353b(a)(5).

If an FDA-approved medicine "appears on the drug shortage list," however, registered outsourcing facilities may use that drug substance to produce compounded copies of the approved medicine. *Id.* §353b(a)(2)(A)(ii), (d)(2)(A). But that limited permission for compounding lasts only so long as the medicine remains in shortage. *Id.* §353b(d)(2)(A); *see id.* §356c(h)(2) ("the term 'drug shortage' or 'shortage,' with

7

respect to a drug, means a period of time when the demand or projected demand for the drug within the United States exceeds the supply of the drug"); *see also* 21 C.F.R. §314.81(b)(3)(iii)(d)(1), (f) (adopting same definition).

4. The tight statutory restrictions on compounding are the product of a lesson learned over time:  Compounding drugs—particularly when produced at scale—can pose serious risk to patients.  The known cases of compounding-caused injuries are horrifying.  *See, e.g., United States v. Cadden*, 965 F.3d 1, 8 (1st Cir. 2020) (outsourcing facility that shipped 17,000 knockoffs of Depo-Medrol® injection contaminated with fungal meningitis to 23 states, leaving scores dead and hundreds sickened); Pew Charitable Trusts, *U.S. Illnesses and Deaths Associated With Compounded or Repackaged Medications, 2001-19* (Mar. 2, 2020), https://perma.cc/H48G-4378; Charlotte Huffman & Mark Smith, *Dozens say they lost eyesight after routine surgery using compounded pharmacy drugs*, WFAA, https://perma.cc/X3E4-6RRA (last updated Feb. 13, 2019).  And many more harmful (or even fatal) cases likely remain unknown, because 503As are not required to report them and outsourcing facilities often fail to do so.

Similar concerns came to the fore almost as soon as compounders began flooding the market once FDA placed tirzepatide on the shortage list.  In July 2024, FDA highlighted "reports describing patients who experienced adverse events following the administration of compounded … tirzepatide."  Letter from Shannon

Glueck, Pharm.D., U.S. Food & Drug Admin., to Philip Dickison, PhD, RN, Nat'l Council of State Bds. of Nursing at 1 (July 16, 2024), https://perma.cc/5SAG-BRBX.  FDA later advised of "multiple reports of adverse events, some requiring hospitalization, that may be related to dosing errors" associated with compounded GLP-1 drugs.  U.S. Food & Drug Admin., *FDA's Concerns with Unapproved GLP-1 Drugs Used For Weight Loss* (Mar. 17, 2025), https://perma.cc/XU63-AYRH.

FDA was not alone in sounding the alarm.  A bipartisan group of State Attorneys General called for "decisive action" on these unsafe and unapproved products.  Nat'l Ass'n of Attys' Gen., *State and Territory Attorneys General Urge FDA to Take Action Against Counterfeit and Illegally Sold GLP-1 Drugs* (Feb. 19, 2025), https://perma.cc/2SVU-YX2V.  The Government of Australia banned compounded anti-obesity medications altogether due to "increasing reports of patients coming to harm."  Dep't of Health and Aged Care, *Protecting Australians from unsafe compounding of replica weight loss products* (May 22, 2024), https://perma.cc/G4PW-JRLW.  Leading domestic patient and consumer groups voiced similar concerns, warning that patients should avoid compounded tirzepatide products "due to uncertainty about their content, safety, quality, and effectiveness."  Nat'l Consumers League, *NCL urges the public to heed warnings about unregulated versions of GLP-1 weight loss drugs* (Feb. 4, 2025), https://perma.cc/8NNE-7Z5G;

9

Am. Diabetes Ass'n, *The American Diabetes Association Announces Statement on Compounded Incretin Products* at 1 (Dec. 2, 2024), https://perma.cc/752H-XQG3.

**B.    Procedural History**

1. Lilly took swift action to address the high demand for its medicines and ensure that patients could be certain that the tirzepatide products they receive are safe and effective.  Lilly invested heavily ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See, e.g.*, ROA.2724-30.  Lilly also obtained supplemental FDA approval authorizing the sale of Zepbound® in single-use vials (it originally was approved in auto-injector devices), providing additional supply capacity.

As a result of Lilly's efforts, FDA was able to update its drug-shortage database in August 2024 to reflect that "[a]ll doses of Mounjaro and Zepbound [were] available."  Ned Pagliarulo, *Zepbound, Mounjaro back in supply as Lilly resolves shortage*, BioPharma Dive (Aug. 5, 2024), https://perma.cc/EK2C-9NMC.  And on October 2, 2024, FDA officially determined that the tirzepatide shortage was resolved, explaining that it had "confirmed with [Lilly] that [its] stated product availability and manufacturing capacity can meet the present and projected national demand."  U.S. Food & Drug Admin., *FDA clarifies policies for compounders as*

*national GLP-1 supply begins to stabilize* at 1 (Oct. 2, 2024), https://perma.cc/SBF8-TZJU.

2. Plaintiff North American Custom Laboratories, L.L.C. Partners d/b/a Farmakeio Custom Compounding ("FarmaKeio"), is a large-scale drug manufacturer operating under the guise of a 503A compounder—it sold nearly ██ ██████ in unapproved tirzepatide during *each month* of 2024, *see* ROA.1734. Plaintiff Outsourcing Facilities Association ("OFA") is a trade association that represents outsourcing facilities that compounded tirzepatide while Lilly's medicines were on FDA's shortage list.  ROA.815-16.  Five days after FDA declared the shortage over, these Plaintiffs filed suit, seeking a TRO and preliminary injunction.  ROA.25-47, ROA.77-78.

3. FDA responded by asking for a stay so it could reevaluate its decision, *see* ROA.294-97, which the district court granted, ROA.302.  Over the next two months, Lilly continued its practice of providing the agency with relevant supply-and-demand data, including a host of additional detailed, quantitative data, such as: ██ █████ stock reports ████████████, ROA.2891, ROA.2919-20, ROA.2929, ROA.3026, historic, cumulative supply-and-demand data ███████, *see e.g.*, ROA.3025, forecasted supply-and-demand numbers ████████████, *see* ROA.3025, and data about ████████████████████████████ ███████, ROA.2907-08.  FDA probed this data, inquiring about Lilly's sources and

methodologies, and seeking additional data or responses from Lilly to claims made by other parties. *See, e.g.*, ROA.2852-53, ROA.2897-900. Lilly replied in detail and provided additional data as needed. ROA.2861-71, ROA.2904-22, ROA.2935-39.

Plaintiffs and their cohorts also submitted voluminous information to FDA trying to convince the agency that Lilly's medicines were still in shortage. But, in contrast to Lilly's comprehensive hard data, Plaintiffs and their cohorts offered duplicative form letters, ROA.2275-76, ROA.2282-83, ROA.2291-92, unverified (and often undated) screenshots, *e.g.*, ROA.2429-50, easily manipulated internet polls, *e.g.*, ROA.2417-20, and news articles, *e.g.*, ROA.2204-06, almost all addressing supply and demand for Lilly's medicines (if at all) only in isolation, at a hyper-localized level, and often just for only one of the 12 doses Lilly makes across the two medicines.

After thoroughly analyzing all the submissions it received, FDA issued a declaratory order and 32-page memorandum on December 19, 2024. ROA.312-23, ROA.1739-70. The order "revoke[d] and replace[d]" FDA's October determination but reached the same conclusion: "[T]he tirzepatide injection product shortage is resolved." ROA.312.

In reaching that conclusion, FDA explained, it considered "detailed information" that Lilly provided "regarding its production and inventory of

12

[Mounjaro® and Zepbound®] at various points in time, including stock reports that show quantities supplied and demanded, and inventory held in stock, for all strengths of [Mounjaro® and Zepbound®]; cumulative quantities supplied to and demanded by [Lilly]'s customers ███████████; projected demand and supply in future months; and wholesaler inventory data, among other information." ROA.1739.

First, FDA explained that the stock reports "demonstrate" that Lilly has been "fulfill[ing] all existing orders" from wholesalers "while generally maintaining … excess inventory." ROA.1743. Those reports showed that Lilly maintained ████████ ████████ finished doses, and ██████████████████ semi-finished doses, of its tirzepatide products in net inventory.[2] *See, e.g.*, ROA.2891, ROA.2919-20, ROA.2929, ROA.3026. While FDA acknowledged that ████████████████ ██████████████████████████████ it found that the data █████████████ ██████████████████████████ supplementing the inventory with quantities ██████████████████████████ ROA.1743; *see also* ROA.2910. In sum, inventory data showed wholesalers "fulfilling nearly all pharmacy orders," ██████████████████████████████████ ██████████

---

[2] "[S]emi-finished" doses are "products that have already completed sterile manufacturing and are awaiting labeling and packaging," which Lilly can do quickly to meet shifting needs. ROA.1744. "[H]aving a robust amount of semi-finished product on hand provides assurance that Lilly has additional ability … to supply" its medicines "relatively quickly." ROA.1744.

██████████████, which FDA noted ██████████████████

███████████████████ ROA.1750. Indeed, distributors had ████████

███████████████████████████████████████████████

███████████████████████████████ ROA.1749.

FDA also concluded that Lilly's historical supply-and-demand data confirmed

that ████████████████████████████ █████████ ███████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████ ROA.1745-49. Based on data from ████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████ ROA.1748, tbl.4; *see* ROA.3025. And those numbers

███████████████████████████████████████████████

█████████████████████ *See* ROA.1748, tbl.4.

Finally, FDA found that Lilly's demand-and-supply forecast ███████████

███████████████████████████████████████ ROA.1753, tbl.6

(citing ROA.3025).[3] Lilly modeled its projections using ████████████

---

[3] During summary-judgment briefing, FDA informed the parties that it had incorrectly tabulated one row in Table 6 of its decision memorandum.  But FDA's tables and Lilly's own reporting ███████████ were based on the correct supply numbers, which continue to reflect that Lilly maintained ████████████████ ████████████████████ *See* ROA.3025.

 ROA.2867,

ROA.2870.  And while it acknowledged that no one can

Lilly explained

ROA.2916-18.  FDA found Lilly's model

ROA.1752.

FDA gave the same careful treatment to the evidence submitted by Plaintiffs and other stakeholders.  After methodically reviewing those submissions, FDA detailed why they suffered from "important limitations" and did "not demonstrate that Lilly will be unable to meet projected demand, especially when weighed against the Lilly-provided data."  ROA.1740; ROA.1754-66.

In short, the additional data confirmed FDA's initial assessment:  The shortage was over.  Nevertheless, "to avoid unnecessary disruption to patient treatment and to help facilitate an orderly transition," FDA announced that it would exercise its

---

FDA's arithmetic error thus had no impact on the agency's conclusion that Lilly's projected supply would exceed projected demand.

discretion to withhold enforcement against unlawful tirzepatide compounding for 60 days for 503As and 90 days for 503B outsourcing facilities.  ROA.320, ROA.323.

4.  FDA advised the district court of its declaratory order the day it was published.  Shortly thereafter, Plaintiffs and FDA moved to reopen the litigation, ROA.356-57, and Lilly intervened as a defendant, ROA.325-26; ROA.394-95.

Plaintiffs amended their complaint, adding facts and arguments based on developments since October while keeping their claims substantively the same.  Specifically, Plaintiffs claimed that FDA violated the APA procedurally by not engaging in notice-and-comment rulemaking or publishing notice in the Federal Register.  ROA.829-31, 835-36.  They also claimed that FDA's no-shortage determination was arbitrary and capricious because (they said) it did not identify key parameters and was "facially incoherent and inconsistent" in construing Lilly's data and improperly discounting contrary evidence.  ROA.831-34.  Finally, Plaintiffs challenged FDA's interpretation of what constitutes a "shortage" under the FDCA.  ROA.834-35.

5. Plaintiffs sought a preliminary injunction based solely on their APA claims, ROA.1706-36, which the district court denied, ROA.1915-44.

The court started with Plaintiffs' procedural arguments.  Because only substantive rules require notice-and-comment procedures, the court began its analysis by "determin[ing] how to categorize the Delisting Action."  ROA.1920-21.

FDA's decision "undoubtably ha[d] immediate legal consequences for specific parties," and the decision to remove Lilly's medicines from the shortage list was "a specific factual determination based on the statutory definition of shortage," not an effort to "promulgate a new policy-type rule or standard that will govern the FDA's future actions." ROA.1929. The court therefore concluded that the decision was an informal adjudication and that FDA acted within its discretion in charting that course. ROA.1921-22; ROA.1930-31. Indeed, the court noted that it may have been an abuse of discretion for FDA to subject its no-shortage determination to all the trappings of notice-and-comment rulemaking, as that would have been "incompatible with Congress's mandate to keep an up-to-date list." ROA.1922-23.

On the substance, the court concluded that FDA's decision was not arbitrary or capricious. ROA.1931-42. The court rejected Plaintiffs' argument that FDA's decision "fail[ed] to identify what time period FDA looked at to make its shortage determination," finding that FDA "explicitly provide[d]," "[o]n multiple occasions," "what period of time on which it based its shortage determination." ROA.1932. The court also rejected Plaintiffs' argument that "the Delisting Action is facially incoherent and inconsistent." ROA.1933. "[T]he question before the Court [was] whether the FDA's decision, that supply of the Lilly drugs outpaced demand for a period of time, was reasonable in light of the evidence before it." ROA.1935. The court "answer[ed] that question in the affirmative," concluding that FDA

17

(1) reasonably considered cumulative data, as FDA needed to consider data for the entire period and "surplus carries over," (2) reasonably ████████████████ ████████, and (3) made reasonable supply-and-demand findings. ROA.1935-38.

Finally, the court rejected Plaintiffs' contention that FDA "arbitrarily waved away all evidence of shortage." ROA.1938-42. Following FDA's lead, the court went through each category of evidence offered by Plaintiffs and agreed that FDA's decision to discount it was both reasonable and reasonably explained. ROA.1935-38. The court also rejected Plaintiffs' charge that FDA treated their submissions with "hyper-skepticism" while giving Lilly's evidence favorable treatment, noting that FDA had not credited all of Lilly's evidence. ROA.1938 & n.12. FDA instead simply made the reasonable determination that Plaintiffs' evidence did not undermine Lilly's submissions or the conclusion that the shortage had ended. ROA.1939-42.

After finding that neither the equities nor the public interest favored injunctive relief, ROA.1944, the court denied the motion.

6. Two days later, the court set an expedited summary-judgment schedule that would have all briefing completed by mid-April. *See* ROA.444 n.1; ROA.1140. Plaintiffs nonetheless appealed the preliminary-injunction order and moved to expedite. CA5.No.25-10385 Dkt.23. FDA then asked the district court to stay proceedings pending Plaintiffs' appeal, ROA.1144-45, but the court denied that

request, indicating that it planned to rule on summary judgment by the end of April, ROA.1153-54.

At that point, Plaintiffs withdrew their motion to expedite their appeal, CA5.No.25-10385 Dkts.41, 49, and changed tactics: They now moved the district court to convert its preliminary-injunction order into a final judgment. ROA.1155-58. Not wanting "to give (or even appear to give) short shrift to the Parties' arguments and positions," the court ordered the parties to submit excerpts of the administrative record they wished the court to consider and set a hearing to decide how best to proceed. ROA.1162-63. Lilly and FDA responded by submitting lists of administrative-record excerpts. ROA.1175-77; ROA.1180-81. Plaintiffs, however, submitted a mini-brief that not only rehashed their preliminary-injunction positions, but made a handful of brand-new arguments. *See* ROA.1945-53. Confronted with new arguments from the same Plaintiffs who had just asked it to grant judgment against them, the court cancelled the hearing, denied the motion to convert, and set an updated summary-judgment schedule. ROA.1183-84.

The next day, Plaintiffs moved for an injunction pending appeal, ROA.1185, which the district court denied, ROA.1199-1202. Plaintiffs then filed an "emergency" motion in this Court seeking the same relief. CA5.No.25-10385 Dkt.59-2. After full briefing, the Court denied Plaintiffs' motion "[f]or substantially

19

the reasons given by the district court in its thorough opinion explaining its denial of a preliminary injunction." CA5.No.25-10385, Dkt.98-1 at 3.

7. Back in district court, the parties cross-moved for summary judgment.[4] After considering "the briefing, record, applicable legal authorities, and [the] Parties' oral arguments," the court denied Plaintiffs' motion and granted FDA's and Lilly's. ROA.4658; ROA.4674.

The court first "fully adopt[ed] th[e] reasoning and conclusion" from its preliminary-injunction order that FDA's determination "[wa]s not a rule and was thus properly promulgated through adjudication." ROA.4661; *see* pp.16-17, *supra*. It also rejected Plaintiffs' arguments (not renewed here) that FDA improperly interpreted the FDCA, as Plaintiffs' view of the statute would essentially preclude FDA from finding a shortage resolved if anyone anywhere is unable to fill a prescription of Lilly's medicines for any period of time. ROA.4661-67.

Turning to Plaintiffs' arbitrary-and-capricious claims, the court again held that FDA's determination that the tirzepatide shortage had resolved was not arbitrary or capricious. FDA provided sufficient explanation for its decision, *see* ROA.4667-71, and "FDA's choice … was not unreasonable in light of the evidence before it," ROA.4671-74. The court again rejected Plaintiffs' argument that FDA did not state

---

[4] After briefing concluded, Plaintiffs filed a motion to dismiss their preliminary-injunction appeal, which this Court granted. CA5.No.25-10385, Dkts.115, 116.

20

what period it evaluated, reiterating that "FDA sufficiently identified that it was considering ███████████████████████████████████

███████████████████████████████████████████

ROA.4668. And the court again rejected Plaintiffs' argument that FDA should have used some other temporal frame, explaining that FDA had no need to consider alternatives since the choice it made was reasonable. *See* ROA.4669.

The court next turned to Plaintiffs' complaints that FDA considered different types of data, their claims that some of the data was irreconcilable, and their charge that FDA unreasonably found ████████████████████████████ ROA.4670-71. As to the first complaint, "FDA was requesting said data in an attempt to get a holistic view," which the court concluded "was not unreasonable." ROA.4670. The court also found Plaintiffs' contentions of "irreconcilable" data unavailing, pointing out that FDA ran down the apparent discrepancies and reasonably found Lilly's explanations satisfactory as to why data that appeared superficially inconsistent was not. ROA.4670. The court also batted away Plaintiffs' complaints that FDA did not consider "product storage, loss, and longevity," pointing to FDA's brief and presentation at the hearing, where FDA indicated that it understood general business practices of shipping out older product first and that Lilly's inventory and supply data reflected doses on-hand that were available to fill orders. ROA.4671. And the court concluded that FDA's finding regarding Lilly's

manufacturing capacity was not unreasonable given that ████████████

████████████████████████████████████████████████████████

████████████████████████   ROA.4670.

The court then addressed arguments that FDA's determination was "facially illogical and inconsistent" because FDA considered ████████████████

████████████████   ROA.4671-73.   Plaintiffs' most specific critique was that

████████████████████████████████████████████████████████

████████████████   The court explained why that claim was mistaken.  First, one of FDA's tables provided ████████████████████████, while the other reflected ████████████████████████████   ROA.4672-73.

Second, the court noted that Plaintiffs ████████████████████████████

████████████████████████████████████████████████████████

████   ROA.4673.   The court thus concluded that FDA's action was not "arbitrarily illogical or inconsistent."   ROA.4673.   Finally, the court rejected Plaintiffs' argument that FDA "arbitrarily waved away all evidence of shortage," noting that even what Plaintiffs held up as their best evidence actually "cut[] directly against their position."   ROA.4673-74.

In short, the court concluded, "FDA's choice to 'give more weight to specific, reliable, comprehensive, and current information from Lilly' was not unreasonable

22

in light of the evidence before it." ROA.4674. The court thus granted summary judgment to FDA and Lilly on all counts. ROA.4674.

## SUMMARY OF ARGUMENT

FDA's conclusion that the tirzepatide shortage was over as of December 2024 (if not earlier) was procedurally proper, substantively reasonable, and well-reasoned. This Court should affirm.

**I.** FDA appropriately proceeded via informal adjudication rather than notice-and-comment rulemaking in deciding whether the tirzepatide shortage was resolved. Rulemakings are "proceedings for the purpose of promulgating policy-type rules or standards." *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973). Adjudications, by contrast, are "proceedings designed to adjudicate disputed facts," *id.*, or to resolve a "concrete and narrow" question of how to apply the law in a way that "would have an immediate and determinable impact on specific factual scenarios," *City of Arlington v. FCC*, 668 F.3d 229, 243 (5th Cir. 2012). That is exactly what happened here. FDA did not promulgate a new rule or standard that will govern future actions. It simply resolved the fact-specific question of whether a shortage of Lilly's medicines persisted, based on the evidence that Lilly, Plaintiffs, and other interested entities presented. That is a classic adjudication. And "[t]here is no notice and comment requirement for an agency adjudication." *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 627 (5th Cir. 2001).

23

In all events, Plaintiffs' procedural claim would fail even if FDA *did* need to proceed via rulemaking, as Plaintiffs were not prejudiced by the process FDA provided. FDA abided by virtually all the notice-and-comment requirements, giving Plaintiffs (and all other interested parties) ample opportunity to submit any and all information they thought relevant, which Plaintiffs did. Plaintiffs got notice, and they commented. They are entitled to nothing more.

**II.** FDA's decision was not arbitrary and capricious—or even close. Under the APA, courts assess whether an agency examined relevant data and reasonably explained its decision. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). FDA's no-shortage decision satisfies that standard in spades.

As detailed in its order and memorandum, FDA considered data provided by Lilly, Plaintiffs, and others to decide whether Lilly's supply exceeded demand. From Lilly, FDA received thorough, quantitative data in zoomed-in and zoomed-out formats that provided the agency with a holistic picture of the supply-and-demand situation involving Lilly's medicines. That empirical and reliable information allowed FDA to confidently conclude that Lilly's supply of its tirzepatide medicines was meeting (in fact, exceeding) demand as of December 19, 2024, and would continue to do so going forward. In stark contrast, Plaintiffs and their allies provided FDA with scattershot and anecdotal evidence that suffered from myriad

shortcomings. It was eminently reasonable for FDA to conclude that Plaintiffs' submissions did not undermine the strong supply showing evidenced in Lilly's data.

FDA also sufficiently explained itself. It identified all the relevant metrics needed to reach an informed judgment; gave a thorough account of Lilly's data and what it found probative (or not, as to some of Lilly's evidence, which the agency did not just blindly credit); and provided equally thorough treatment to all Plaintiffs' submissions, explaining why they suffered from significant limitations that made them not probative of the statutorily prescribed analysis.

Ultimately, Plaintiffs' complaints evince only their own (not FDA's) lack of attention to detail, their own (not FDA's) confusion about what Lilly's evidence depicted, their own (not FDA's) ignorance of how supply and demand work in the real world, and their own misunderstandings (or mischaracterizations) of how FDA fulfilled its statutory task. But no matter how much Plaintiffs throw at the wall, nothing sticks. FDA not only reasonably evaluated the evidence and reasonably explained itself; it reached the only conclusion that it could under the facts and the law: Lilly's tirzepatide medicines are not in shortage.

## STANDARD OF REVIEW

This Court reviews the grant of summary judgment de novo. *Shell Offshore*, 238 F.3d at 627. It also reviews de novo whether FDA's determination "was a 'rule' for APA purposes." *Id.* And it reviews the substance of FDA's determination under

25

the APA's "well-worn arbitrary-and-capricious standard." *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 567 (2025).  Arbitrary-and-capricious review "is narrow," *id.* (quoting *State Farm*, 463 U.S. at 43), and "highly deferential," *Hayward v. U.S. Dep't of Lab.*, 536 F.3d 376, 379 (5th Cir. 2008) (per curiam) (quoting *United States v. Garner*, 767 F.2d 104, 116 (5th Cir. 1985)).  "If the agency 'articulates a rational relationship between the facts found and the choice made' it does not act arbitrarily or capriciously." *Joseph v. Dir. of Tx. Serv. Ctr.*, 2025 WL 458001, at *3 (5th Cir. Feb. 11, 2025) (per curiam) (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974)).

## ARGUMENT

## I.    Plaintiffs Received All The Process They Were Due (And Then Some).

Determining whether the shortage of Lilly's tirzepatide products had resolved did not require all the trappings of formal notice-and-comment rulemaking—although FDA provided Plaintiffs with notice and an opportunity to comment anyway, which they did.  There thus was no error, let alone any prejudicial one.

### A.    FDA Properly Proceeded Via Informal Adjudication.

Rulemakings are for "promulgating policy-type rules or standards." *Fla. E. Coast Ry.*, 410 U.S. at 245.  Deciding whether a drug is in shortage does not require promulgating a new policy-type rule or standard; it just requires finding facts and applying existing law to them.  In other words, it requires adjudication.

That is exactly what happened here. FDA resolved the fact-specific question of whether the shortage of Lilly's tirzepatide medicines persisted by collecting facts concerning whether supply of those medicines exceeded demand and then applying the law to those facts. ROA.1929-30. That is not a legal interpretation of the statute; it is an adjudication of facts based on evidence that Lilly, Plaintiffs, and other interested entities presented. ROA.1929-30. And "[t]here is no notice and comment requirement for an agency adjudication." *Shell Offshore*, 238 F.3d at 627.

FDA's determination also had "immediate and determinable impact," another hallmark of adjudications. ROA.1927-28; *see City of Arlington*, 668 F.3d at 243. Even Plaintiffs admit that FDA's decision that the tirzepatide shortage is over had "general applicability," as it meant that outsourcing facilities nationwide could no longer compound tirzepatide, effective immediately. Pltfs.Br.15. Indeed, Plaintiffs premised their entire lawsuit on "the immediate effect the Delisting Action ha[d] on them," arguing that FDA's decision deeming the shortage over forced their tirzepatide products "'off the market.'" ROA.1929 (quoting ROA.1713).

Plaintiffs contend that the determination's general applicability (somehow) makes it a rule that required full-blown notice and comment. Pltfs.Br.15. They are wrong. An "impact on other entities" does not "transform an informal adjudication into a rulemaking." *Neustar v. FCC*, 857 F.3d 886, 895 (D.C. Cir. 2017). Nor does the fact that FDA's determination "has 'the force and effect of law'" make it a rule.

27

Pltfs.Br.15 (quoting *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015)). That argument mixes up two distinct questions. Whether a *rule* "ha[s] the 'force and effect of law'" is what divides *legislative* from *interpretive* rules, only the former of which require notice-and-comment procedures. *Perez*, 575 U.S. at 96; *see also Mock v. Garland*, 75 F.4th 563, 579 (5th Cir. 2023). But not everything that has the force and effect of law is a legislative rule. Indeed, adjudications are supposed to "have an immediate and determinable impact," *City of Arlington*, 668 F.3d at 243—i.e., the force and effect of law. They just have that impact *by resolving concrete disputes* in the context of "specific factual scenarios," rather than by making broader pronouncements of law or policy. *Id.*

Trying another tack, Plaintiffs claim that FDA's determination must be a rule because it effectively "create[d] a future prohibition" on mass-producing compounded tirzepatide. Pltfs.Br.22-23, 26-27. That (il)logic elides the statute: The "prohibition" on mass-producing compounded drugs comes not from FDA, but from Congress, which provided that outsourcing facilities may not make via compounding "essentially a copy of one or more approved drugs," 21 U.S.C. §353b(a)(5), unless a drug "appears on the drug shortage list," *id.* §353b(a)(2)(A)(ii), (d)(2)(A). The governing legal rules thus have already been set by Congress; FDA simply decided whether the facts on the ground established that the baseline statutory prohibition should once again take effect.

28

This is black-letter law that gets applied all the time, including in highly analogous contexts. Consider FDA's new-drug-application ("NDA") approvals under 21 U.S.C. §355(d)-(g). There as here, "FDA reviews data submitted by a company and determines whether it satisfies" statutory criteria. ROA.1927 n.5. And there as here, when FDA approves an NDA, that decision "affect[s] large numbers of third parties" by (among other things) "triggering statutory restrictions on compounding drugs that are essentially copies of the approved drug." ROA.1927. Nevertheless, the Supreme Court has long held that FDA may use informal adjudication to decide whether to grant a new drug application. ROA.1927 & n.5 (citing *Weinberger v. Hynson, Westcott & Dunning*, 412 U.S. 609, 624-26 (1973)). The Court has done so, moreover, even though such determinations are typically captioned by reference to the drug, not its manufacturer—because all understand that a decision about a specific drug is a decision about its manufacturer. *Cf.* 21 U.S.C. §356e(b)(1)-(2) (shortage-list entry must include "[t]he name of the drug in shortage" and "[t]he name of each manufacturer of such drug"). There is no basis for a different conclusion here.

Quite the opposite. It would make no sense to force FDA to go through full-blown notice-and-comment procedures in this context. Congress' directive to FDA is to keep an *up-to-date* list of drugs that are in shortage. 21 U.S.C. §356e(a). Making FDA spend months and months engaging in full-blown notice-and-comment

29

rulemaking would be inconsistent with that clear directive. ROA.1922-24. Additionally, as the district court noted, "a simple review of the redacted version of Plaintiffs' Brief in Support of its Motion [for Preliminary Injunction] evidences the difficulty—if not the impossibility—of giving sufficient notice of the data that the FDA relied upon in drafting the proposed 'rule,' and allowing for meaningful comment on it." ROA.1923 n.3. And the statute expressly contemplates that FDA does not have to make shortage information available to the public at all. *See* 21 U.S.C. §356e(c)(3). Those timing and confidentiality concerns explain why Congress did not require FDA to proceed via rulemaking in this context.

They also readily distinguish the various cases Plaintiffs invoke involving listing decisions under different statutes, as most of those statutes expressly require the relevant agency to act through rulemaking. *See Green Rock v. IRS*, 104 F.4th 220, 222 (11th Cir. 2024); *Mann Constr. v. United States*, 27 F.4th 1138, 1143 (6th Cir. 2022); *NRDC v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1401-04 (9th Cir. 1995); *Ctr. for Bio. Diversity v. Everson*, 435 F.Supp.3d 69 (D.D.C. 2020). "Of course, if a statute requires rulemaking, the affected agency must comply." *Wages & White Lion*, 604 U.S. at 565. But Congress chose *not* to require shortage determinations to proceed through notice-and-comment rulemaking. That was no oversight; Congress *did* use rule-

30

mandating language in *other* parts of the FDCA.   *See, e.g.*, 21 U.S.C. §353b(a)(2)(A)(i)(I)-(III).  That choice was Congress' to make, and it is dispositive.

Plaintiffs' remaining cases do not help them either.   In *Safari Club International v. Zinke*, 878 F.3d 316 (D.C. Cir. 2017), *see* Pltfs.Br.22-26, the agency's enhancement findings were "basically legislative-type judgment[s]" that considered several factors to determine what would "enhance the survival of the species."  878 F.3d at 321-22, 324.  Here, by contrast, FDA simply made a "factual determination on whether one number [supply] was bigger than another [demand]" at certain periods in time.  ROA.1930.  And while the findings in *Safari Club* did not "result[] in … immediate legal consequences for any specific parties," 878 F.3d at 333-34, FDA's determination did, *see* p.27, *supra*.  Indeed, as explained, those consequences form the basis of Plaintiffs' complaint.  And, as *Safari Club* recognized, "adjudications immediately bind."  878 F.3d at 333.

As for *Anne Arundel County v. EPA*, 963 F.2d 412 (D.C. Cir. 1992), the agency action there was placing a new site "on the National Priorities List," also known as the Superfund list.  *Id.* at 413.  Whether to add a new site to the Superfund list entails a complex policy judgment made "on the basis of the Hazard Ranking System[,] … a set of criteria which measure the risk of harm to the environment from the migration of hazardous substances from the site by way of three routes: groundwater, surface water, and/or air."  *Id.* at 414.  That type of risk-assessing policy judgment is

worlds away from a drug-shortage determination, which simply entails looking at supply and demand in real time—something that a protracted notice-and-comment proceeding would frustrate rather than facilitate.[5]  *See* ROA.1924-25 (illustrating this problem).  Furthermore, whereas FDA will remove a drug from the shortage list as soon as demand no longer exceeds supply, it usually takes years (and billions of dollars) of cleanup to get off the Superfund list—which is why property owners are entitled to the most robust administrative process before a listing decision is made.  That is quite different from the situation here, where FDA has never gone through notice-and-comment rulemaking before *adding* a drug to the shortage list.

Indeed, that makes Plaintiffs' argument not just wrong, but self-defeating.  Plaintiffs claim that FDA's decision that Lilly's tirzepatide products were not in shortage as of December 2024 (at the latest) was a substantive rule that required formal notice-and-comment procedures.  But the APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule."

---

[5] A risk-assessing policy judgment also distinguishes *National Association of Farmworkers Organizations v. Marshall*, 628 F.2d 604 (D.C. Cir. 1980), where a court assessed the validity of an agency's decision to promulgate rules listing and delisting pesticides that the agency determined posed too great a risk to the health of 10- and 11-year-old agriculture workers.  *Id.* at 610-11.  And while that 45-year-old case noted that, "in the context of health risks, notice and comment procedures assure the dialogue necessary to the creation of reasonable rules," *id.* at 621, any "dialogue" necessary here happened when FDA voluntarily agreed to reopen its review and give interested parties a months-long chance to submit any evidence they thought relevant to its determination.  *See* Part I.B., *infra*.

*Perez*, 575 U.S. at 101. And FDA did not use notice-and-comment procedures when it placed Lilly's medicines on the shortage list. So, if Plaintiffs (somehow) were right that FDA's *de*-listing decision required notice and comment, then Lilly's medicines were never validly on the list in the first place—leaving Plaintiffs with no legal basis "to compound their versions of the Lilly's Drugs." ROA.1925. Conversely, if FDA could properly place medicines *on* the list without notice and comment, as it always has, then it could also take them *off* the list without notice and comment. *See* ROA.1925-26 n.4. Either way, Plaintiffs lose. ROA.1925.

Plaintiffs protest that FDA did not rely on this "lose-lose" logic in deciding to proceed via adjudication here. *See* Pltfs.Br.27. But that misses the point. FDA has *never* used notice-and-comment rulemaking to determine whether a drug is in shortage. The (il)logical consequence of Plaintiffs' position, then, is that no drug has *ever* been validly added to the shortage list. That itself is a strong reason to doubt their view.

In short, "[t]he FDA's Delisting Action made a factual determination about whether ████████████████████████████████████ ████████ the supply of the Lilly Drugs was equal to or greater than the demand. It did not make a policy-like determination." ROA.1930. That is not the stuff of rulemaking. FDA did not err by choosing to proceed through informal adjudication.

33

### B.    Plaintiffs Suffered No Prejudice In All Events.

Even if notice and comment *had* been required, Plaintiffs would be in no position to complain, as they got both notice and the opportunity to comment— which they did.  The APA mandates that "due account shall be taken of the rule of prejudicial error."  5 U.S.C. §706; *accord Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 684 (2020); *United States v. Johnson*, 632 F.3d 912, 930 (5th Cir. 2011).  The "touchstone" of that analysis is "whether it is clear that the lack of notice and comment did not prejudice the petitioner."  *City of Arlington*, 668 F.3d at 244.  And the burden is on "the party asserting error to demonstrate prejudice."  *Id.* at 243.  Plaintiffs cannot make that showing here.  As they admit, they were not just "aware of FDA's consideration"; they "were able to provide evidence," which FDA carefully reviewed.  Pltfs.Br.29-30.  And Plaintiffs have never identified even one piece of information that they would have submitted had FDA used different procedures.  Their "continued failure to identify the evidence [they] would have submitted indicates that [Plaintiffs] w[ere] not prejudiced by any inadequacy."  *Am. Airlines v. DOT*, 202 F.3d 788, 797 (5th Cir. 2000).

Plaintiffs' inability to come up with anything they think they lost as a result of FDA's process is unsurprising; FDA abided by virtually all the requirements of notice-and-comment rulemaking in deciding whether the tirzepatide shortage had resolved.  *Cf. Little Sisters*, 591 U.S. at 683-84 (holding that agencies satisfy the

34

APA when they provide all required elements, "[f]ormal labels aside"). The APA requires an agency engaged in notice-and-comment rulemaking to publish a proposed action in the Federal Register, identify the legal authority for the action, describe the subjects or issues involved, provide an opportunity to submit views, concisely state its final reasoning, and leave 30 days before the rule takes effect. *Id.* at 683-86 (citing 5 U.S.C. §553(b)). FDA fulfilled all but one of those requirements. FDA's voluntary remand motion identified the legal authority for its delisting decision, ROA.294 (citing 21 U.S.C. §356e(a)), and indicated the subjects or issues involved: delisting of Lilly's tirzepatide products, ROA.294-95. FDA accepted submissions from Plaintiffs and other interested parties regarding whether a shortage persisted. *See, e.g.*, ROA.313 (describing FDA's consideration of "potentially relevant information … from patients, healthcare providers, and others, including compounders"). FDA explained its reasoning in its declaratory order and accompanying decision memorandum. *See* ROA.312-23; ROA.1739-70. And FDA exercised its discretion to not pursue enforcement actions against 503A and 503B compounders for 60 and 90 days, respectively, from the date of the order—a doubling and tripling of the time required by §553 for a rule to take effect. ROA.314. The only thing FDA did not do was publish notice in the Federal Register. But publication is not required when interested parties have "actual notice." 5 U.S.C. §553(b). And Plaintiffs admit that they had actual notice here.

Unable to show prejudice, Plaintiffs insist that it is not necessary. Pltfs.Br.29. But the sole case they cite for that claim, *W & T Offshore v. Bernhardt*, 946 F.3d 227 (5th Cir. 2019), did not discuss *either* §706 *or* harmless error. And cases from this Circuit that *do* discuss §706 and harmless error have reached the straightforward conclusion that a party cannot get agency action set aside by complaining about a procedural error that did not prejudice that party. *See, e.g.*, *City of Arlington*, 668 F.3d at 243-46; *cf. Wages & White Lion*, 604 U.S. at 586-91 (reaffirming the vitality of "the APA's … 'rule of prejudicial error'"). Plaintiffs' argument that maybe *someone else* would have provided more evidence had all notice-and-comment requirements been followed is therefore beside the point. Pltfs.Br.29-30. Plaintiffs must show harm to "the petitioner"—i.e., *themselves*—not to some unidentified, hypothetical would-be commenter. *City of Arlington*, 668 F.3d at 243-44; *see also Little Sisters*, 591 U.S. at 684.

In any event, the suggestion that *anyone* suffered prejudice here is difficult to take seriously when Plaintiffs undertook an extensive "internet letter-writing campaign," ROA.1757, to ensure that commenters would flood FDA with submissions supporting their claim that a shortage persisted—which they did, *see* p.12, *supra*. Plaintiffs' real complaint thus is not that they lacked the opportunity to try to persuade FDA; it is that they failed to do so. But no amount of notice and comment would have changed the reality that the shortage is over. *See* Part II, *infra*.

## II.    FDA's Determination Was Well-Reasoned And Reasonable.

After voluntarily reevaluating its initial decision in October 2024 that the tirzepatide shortage was resolved, FDA spent two months soliciting, receiving, and reviewing evidence.  It then issued a 32-page memorandum summarizing and addressing the submissions presented to it from all sides.  FDA identified the data and information on which it relied and explained how it weighed everything, including materials presented by Plaintiffs and others.  FDA prioritized reliable, holistic data about manufacturing supply and orders from distributors ████████ ████ over cherry-picked, anecdotal, or unexplained snapshots purporting to show "difficulty" in obtaining Mounjaro® and Zepbound®.  That was the only reasonable course FDA could take given the record; it certainly was not arbitrary and capricious. The district court thus correctly granted summary judgment to Lilly and FDA on Plaintiffs' arbitrary-and-capricious claims.

### A.    FDA Properly Identified Key Parameters and Made the Requisite Findings.

Plaintiffs begin by arguing that FDA failed to "disclose what 'period of time' [it] chose to analyze." Pltfs.Br.32.  As the district court noted, this argument "plainly fails."  ROA.1932.  "On multiple occasions, the Delisting Action clarifies that it considered the previously produced supply and demand numbers for ██████████ ██████████, as well as the recently released ██████████ numbers and the projected numbers through ██████████  ROA.1932  (citing ROA.1739,

37

ROA.1745-48, ROA.1752-53). Plaintiffs' argument thus essentially boils down to claiming that FDA needed to incant the words ███████████████████ ██████████████ The APA does not impose anything close to that sort of clear-statement rule.

Unable to seriously dispute that "FDA sufficiently identified that it was considering ████████████████████████████████████ ████████████████████████████████████ ROA.4668; *see* Pltfs.Br.36 (recognizing that FDA reviewed data ███████████ ███████, Plaintiffs quibble with how FDA looked at that data, complaining that FDA presented findings in different "temporal formats" ██████████████ Pltfs.Br.33-34. But those different "temporal formats" were just how FDA made sure it was getting a holistic understanding of the supply-and-demand situation. *See* ROA.4668-69. An agency's decision to consider both zoomed-in and zoomed-out views of the same landscape to assess the whole picture is something to be commended, not lambasted. It certainly does not provide a valid basis to second-guess FDA's decisionmaking (let alone obscure the fact that FDA made its assessment ████████████████████████████). Just the opposite: An agency acts *especially* reasonably when it considers different types of data from different angles in making the kind of present-day and predictive assessment at issue here, as that approach is the best way to cross-check results. *See* ROA.4668-69.

38

Plaintiffs next complain that certain parts of FDA's opinion present Lilly's supply-and-demand data in "cumulative" figures. Pltfs.Br.33. According to Plaintiffs, FDA should have considered each month in isolation because, had it done so, it would have seen that demand exceeded supply in some months. Pltfs.Br.33-35. Plaintiffs are wrong both factually and legally. Lilly's supply of its medicines does not reset to zero each month; with proper refrigeration, the medicines can be stored for "up to 24 months." ROA.1937 n.10. Excess supply in one month thus "carries over" to the next. ROA.1937. So even if FDA had focused on the numbers for each individual month, it still "would have had to add them together"—i.e., consider the data cumulatively—"to get the total numbers for the relevant period." ROA.1936-37. Indeed, it would have been arbitrary and capricious in the extreme to follow Plaintiffs' start-each-month-over-from-zero approach, as that would have left FDA ignoring the indisputable reality that surplus supply in one month can meet demand in another. That basic reality "answers" all the "questions" that Plaintiffs claim "[t]he cumulative approach" raises. Pltfs.Br.34.

Plaintiffs complain that those "answers" were provided by the district court in what they call "*post hoc* rationalization[s]." Pltfs.Br.34, 36-37. But under arbitrary-and-capricious review, courts must uphold agency action if they can "reasonably … discern[]" "the agency's path." *Hayward*, 536 F.3d at 380. In that assessment, "common-sense determination[s] pass[] muster, particularly in an informal

39

adjudication." *Phoenix Herpetological Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*, 998 F.3d 999, 1005 (D.C. Cir. 2021). Attributing common sense to FDA's determination is thus exactly what the court was supposed to do. And it does not get more commonsensical (or obvious) than surplus does not evaporate just because a new month begins. The fact that FDA did not explicitly note that it understands the shelf-life of the medicines it regulates is no basis to set aside its decision.

Switching gears, Plaintiffs complain that FDA failed to explain *why* it considered cumulative figures ▮▮▮▮▮▮▮▮▮▮▮▮▮ rather than using supposedly "readily apparent 'alternative[s].'" Pltfs.Br.38 (alteration in original) (quoting *State Farm*, 463 U.S. at 50); *see also* Pltfs.Br.36-37 (collecting cases). But unlike in the cases Plaintiffs cite, there were no apparent alternatives in the relevant sense here. As just discussed, FDA *had to* account for the fact that "surplus carries over" no matter what time period it chose lest it miss the real picture. ROA.1936-37.

That also defeats Plaintiffs' complaint that FDA ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ Pltfs.Br.37. The question FDA had to answer was whether, as of December 2024, "demand or projected demand for [Lilly's tirzepatide] drug[s] within the United States exceed[ed] the supply of th[ose] drug[s]." 21 U.S.C. §356c(h)(2). FDA had to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ And FDA's approach of looking at *both* supply *and* demand ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

40

████████ ; after all, Lilly would not be building up a surplus if there was still outstanding demand to meet.

Plaintiffs' real problem thus is not the dates FDA used, but what the data showed:  Plaintiffs do not dispute that Lilly had ████████████████████ ████████████ ROA.1748, or that ████████████████████ ███████████████████████████████████████████████ ███████████████████████████ was more than sufficient to overcome any slight month-by-month deficits that might arise.

███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████

ROA.1748.  That growing surplus is proof positive that Lilly's supply of Mounjaro® and Zepbound® was (and is) exceeding demand as of December 2024.

As a last-ditch effort, Plaintiffs argue that FDA's choice to analyze data ████ ██████████████████████ conflicts with the statutory requirement that the shortage list be "up-to-date," *see* 21 U.S.C. §356e(a), apparently because they think "up-to-date" means that FDA could consider only the absolute most recent data. Pltfs.Br.39-40.  That makes no sense.  To be sure, the ultimate statutory question is whether a drug is in shortage at the time of the decision, *see* 21 U.S.C. §356c(h)(2), and FDA must consider recent information to make that determination, *see id.* §356e(a) (requiring FDA to "maintain an up-to-date list of drugs that are determined

41

by [FDA] to be in shortage in the United States"). But that hardly means isolated, present-day data is the only thing that matters. While considering the latest information may be *necessary* for a decision to be "up-to-date," the most recent data is not always *sufficient* to paint a full picture of supply and demand. After all, shortage determinations would not be particularly useful if FDA had to confine them to a snapshot, as it matters whether supply is likely to *keep* meeting demand, too.

FDA's decision to look at a broader period, covering both the recent past and projections about the near future, was thus entirely sensible and consonant with the statute. *See* ROA.4662-63; ROA.4668-69. Indeed, only by looking at data through zoomed-in and zoomed-out supply-and-demand pictures could FDA confidently conclude Lilly had amassed sufficient surplus supply to keep up with demand fluctuations in the present and near future. In other words, the *historical* data supported FDA's conclusion that "supply is meeting or exceeding demand for [Lilly's] drugs" *in the present*. ROA.1746.[6]

---

[6] Plaintiffs complain that, under FDA's approach, Lilly's products might never again be in shortage, because ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ Pltfs.Br.40. But that possibility does not mean that FDA's approach is incorrect; it simply reflects Lilly's historic efforts to increase its supply capacity to enable it to serve all demand.

**B.    FDA's Analysis of and Reliance on Lilly's Comprehensive Data Was Reasonable and Reasonably Explained.**

Plaintiffs argue that FDA failed to properly analyze the evidence Lilly supplied, and that had it just looked at it the way Plaintiffs wish, it would have seen a shortage.  Pltfs.Br.40-43.  But Plaintiffs elide what Lilly's evidence showed.  They also want this Court to ask the wrong question.  Under the APA, the question "is whether the FDA's decision, that supply of the Lilly drugs outpaced demand for a period of time, was reasonable in light of the evidence before it."  ROA.1935.  As the district court carefully explained, the answer is "affirmative."  ROA.1935.

1. Before diving into the details of the data, it is worth taking a step back. Lilly was already providing FDA with supply and demand data for both of its tirzepatide medicines when FDA decided to reevaluate the shortage determination in light of Plaintiffs' lawsuit.  But, to give FDA the most complete picture, Lilly began sending FDA even more data ██████████████████████████ ROA.2795; ROA.2842-43.   That data included ██████ stock reports ██ ████████████████████ that showed ████████████████████ ████████████████████████████████████ ████████████████████████████ ROA.2891, ROA.2919-20, ROA.2929, ROA.3026; historical supply-and-demand data ████ ██████████ which allowed FDA to see that Lilly had ██████████ ████████████████████████████████████

43

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████ *e.g.* ROA.3025; forecasted supply-and-demand █████████████

showing that Lilly would continue to meet demand going forward, *see* ROA.3025;

and what data Lilly could obtain about inventory in the distribution channel,

ROA.2907-08.

In stark contrast to the one-sided picture Plaintiffs try to paint, FDA did not

just blindly accept this data.  On the contrary, FDA on numerous occasions sent

follow-up inquiries to Lilly asking for clarification about Lilly's sources and

methodologies, additional information, and/or responses to competing or

contradictory claims by other sources.  *See, e.g.*, ROA.2852-54, ROA.2897-900.

Lilly responded with detailed answers in each instance, providing additional and/or

more granular data to help address FDA's questions or concerns.  *See, e.g.*,

ROA.2861-71, ROA.2904-22, ROA.2935-39.  That suffices to lay to rest any claim

that FDA simply accepted Lilly's submissions at face-value—let alone that FDA did

not understand the data Lilly was submitting.

2. Plaintiffs now nitpick the data, but their complaints just confirm that they,

not FDA, failed to understand what each piece was intended to show.  For instance,

they claim that ███████████████████████████████████████████

███████████████████████████████████████████  Pltfs.Br.42-43.

44

Plaintiffs miss the forest for the trees. To be sure, FDA's Table 5 shows that ███████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████ Pltfs.Br.43 (referencing

ROA.1750, tbl.5); *see also* ROA.1748, tbl.4. But Table 5 represents ████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████ *See* ROA.1745 ████████████████████████████

████████████████████████████████████████

      Furthermore, Table 5 represents ████████████████████████████████

*See* ROA.1750, tbl.5 (referencing ROA.2907-08). Thus, as the district court

recognized, ROA.4673, ████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████ And Lilly regularly ships ██████████████████████████

██████████████████████████████ *See, e.g.,* ROA.3180 ████████████████

████████████████████████████████████ Plaintiffs also ignore that

Table 5 shows ███████████████████████████ ROA.1750, tbl.5, while Table 4

███████████████████████████████████████████ ROA.2921 (emphasis

added), which, as the district court explained, ROA.4672-73, ██████████████████

██████████████████ Plaintiffs' supposed deficit is therefore easily explainable (and

wrong) when one understands what each piece of data reflects—which Plaintiffs provide no reason to think FDA failed to do.

That same failure to understand what different pieces of evidence show infects (and suffices to rebut) Plaintiffs' remaining arguments. For instance, Plaintiffs contend that "Table 1 shows seemingly random inventory snapshots with no comparable report of demand," and that "the inventory figures ███████████

███████████████████████████████████████████████████████

Pltfs.Br.43 (citation omitted). There is nothing "random" in those numbers. What Plaintiffs miss is that ████████████████████████████████████████

████████████████████████████████████████ ROA.1745, tbl.1 (emphasis

added). Phrased differently, it shows ████████████████████████████

███████ As for their characterization of ████████████████████████ as ████

███████████████████████████ Plaintiffs conflate those figures—████████

██████████████████████████████████████████████████████████

███████ *Compare* ROA.1745, tbl.1 ████████████████████████████████

██████, *with* ROA.1745-48 & tbl.4 ████████████████████████████████

3. Moving from misunderstanding data to misunderstanding logic, Plaintiffs complain that FDA found Lilly ████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ Pltfs.Br.44

46

(quoting ROA.1751).   But FDA's

See ROA.1751.  And the fact that

Lilly

, *see* ROA.1748, tbl.4

; *see also* Pltfs.Br.41.  After all, FDA found

Lilly's past projections about how much it could produce

ROA.1752 (emphasis added).   And, of course,

Finally,

*see* Pltfs.Br.41, tbls.A-B,

[7]

### C.   FDA Considered Plaintiffs' Submissions and Reasonably Found Them Unreliable and/or Not Particularly Probative.

Plaintiffs lastly argue that FDA "[b]rushed [o]ff" their evidence and that of their cohorts.  Pltfs.Br.46-51.  But Plaintiffs can make that claim only by ignoring or

---

[7] Plaintiffs' tables also refute their assertion that FDA made "no comparable finding of demand," Pltfs.Br.46, since their tables *are derived from FDA's tables*. *See* ROA.1748, tbl.4; ROA.1753, tbl.6.  That FDA did not feel the need to break the data down by monthly totals does not mean that it made no monthly demand findings at all.

mischaracterizing FDA's decision.  While Plaintiffs continue to insist that FDA held them to a higher bar, as the district court recognized, FDA "scrutinized and rejected some of Lilly's evidence" when it found that evidence to suffer from limitations, ROA.4673 n.5 (citing examples)—a reality Plaintiffs simply ignore.  Furthermore, FDA spent 13 pages of its 32-page decision addressing the various categories of information submitted to try to show a shortage and explaining in detail why it did not find that information very probative.  *See* ROA.1754-66.  FDA did not put a thumb on the scale.  It just reached the only result the evidence supported.

1. Plaintiffs begin by pointing to screenshots that they say show that wholesalers had no or restricted supply of Lilly's tirzepatide products.  Pltfs.Br.47-48.  FDA assessed these screenshots and explained that they suffered from myriad limitations, including that many were undated, did not account for distribution chain dynamics unrelated to the adequacy of supply, and "show[ed] at most only disconnected individual 'snapshots' in time."  ROA.1757-59.  In light of those limitations, FDA reasonably concluded that "[t]he evidence provided by Lilly … provide[d] a much fuller picture of the supply and demand situation both over time, and at the national level."  ROA.1759; *see also* ROA.4673-74.

Plaintiffs object that some submissions were dated or were accompanied by dated cover notes. *See* Pltfs.Br.47.[8]  But their cherry-picked selection ignores the high volume of screenshots that had no such information at all. *See, e.g.*, ROA.3657-720.  Moreover, although some cover notes have dates, there is no way to tell whether the screenshots submitted with them are from those dates.  For instance, ROA.3720 is a screenshot dated November 21, 2024, but it was submitted with a packet of screenshots on December 17, 2024.  And some screenshots with dates are duplicates. *Compare, e.g.*, ROA.3665, *with* ROA.3667, *and* ROA.3677.  In fact, the entire range from ROA.3749-812 appears to be duplicative of ROA.3657-720.

Plaintiffs next claim that "many screenshots do provide information about length of time the product is out of stock," Pltfs.Br.47, referencing a ▮▮▮▮▮▮▮ screenshot that says "Date not provided by manufacturer" in a field for expected availability in one particular distribution center, ROA.3677, and another screenshot that says "[b]est dating available is 06/22/2025," ROA.3678.  But the same screenshots show that ▮▮▮▮▮▮▮ had all dosage strengths of Lilly's products in stock; it just was apparently restricting orders for some doses to five units. ROA.3677, ROA.3678.  At any rate, "[d]ate not provided" is not an indication of

---

[8] It is unclear why Plaintiffs cite ROA.3487-88 to support this claim, as those pages are a cover note for a comment on FDA's compounding docket from Birchwood Family Medicine.

how long a replenishment might take, much less that any delay will be long-term.

And while it is not even clear what "best dating available" was referring to, it cannot

be seriously thought that Lilly—██████████████████████████ ████

████████████████████████████████████ (which

Plaintiffs do not dispute), *see* ROA.3225—would not be able to supply *any* doses to

a wholesaler until June 2025.  These evidentiary shortcomings also suffice to rebut

Plaintiffs' suggestion that those submissions showed supply disruption of a national

magnitude, as those submissions revealed no supply disruptions at all.  *See*

Pltfs.Br.48.[9]  No wonder FDA did not put much stock in these screenshots.[10]

2. *Contra* Pltfs.Br.48-49, FDA did not unfairly discount survey reports.  While

Plaintiffs claim that those surveys (somehow) show ████████████ of individuals

unable to obtain tirzepatide medicines at certain points in certain places, FDA spent

---

[9] There is also no evidence to support Plaintiffs' suggestion that Lilly chose to "limit supply in one or a few regions," Pltfs.Br.48—because Lilly did not.

[10] Plaintiffs also cite ROA.3665-67, ROA.3712, ROA.3756-58, ROA.3768-69, ROA.3771, and ROA.3803.  *See* Pltfs.Br.47-48.  Several of these screenshots appear to be duplicates.  *Compare* ROA.3665, *with* ROA.3667, *and* ROA.3677; ROA.3666, *with* ROA.3678; ROA.3712, *with* ROA.3665, *and* ROA.3666; ROA.3757-58, *with* ROA.3665-66; ROA.3769, *with* ROA.3677.  And the non-duplicate screenshots either do not indicate ordering was limited, ROA.3768, or show that a wholesaler was low on (at most) only one dose of Lilly's medicines.  *See* ROA.3756; ROA.3771, ROA.3803.  Some screenshots even show that wholesalers had good supply of most doses yet still limited ordering quantities, *see* ROA.3756, which reflects that wholesaler-imposed ordering limits are not necessarily supply-related.

several pages explaining why it "conclude[d] that [these reports] do[] not undermine or outweigh the information submitted by Lilly." ROA.1754-57.

As FDA detailed, these "report[s]" suffered from significant "limitations." ROA.1756. Looking at a Hims & Hers Health tracker, for example, FDA noted that this survey was just "an internet form that anyone can complete" and that it lacked significant controls, such as asking respondents to report only recent access challenges or instructing respondents to explain the nature of their trouble accessing the product. ROA.1755; *see also* ROA.3733 (survey's frequently-asked-questions page inviting "[a]nyone who has had trouble getting access to a GLP-1 medication in the past" to fill out tracker); ROA.4483-85 (screenshots submitted on behalf of Lilly showing a response using fake email). FDA also discussed a report from OFA purporting to show approximately ▮▮▮▮ with a date and time (but no indication of what those dates and times signify), a patient zip code, and a yes/no answer to the question, "Have you attempted to have a prescription filled at more than one pharmacy?" ROA.1755 (referencing ROA.2155-56). As with the Hims tracker, FDA noted that this "report" did not include details of the reporting individuals' experiences; nor was it clear how the information was collected. ROA.1755-56. Indeed, it is not apparent that all the entries are trustworthy given that one is for the zip code ▮▮▮, which is not a valid U.S. zip code. *See* ROA.2155.

As FDA explained, these limitations made it impossible to discern whether a patient's reported challenge involved a manufacturer supply issue, an inability to obtain a prescription from a doctor, or an insurance-coverage problem, undermining the reports' probative value as to the statutory question. ROA.1755-56. Indeed, the submissions' opacity about what time period(s) they covered makes them unhelpful even as a cross-check; some (or all) of them may have addressed earlier periods during which all agree that supply constraints existed. Furthermore, because there was no control on who could fill out the Hims form, it is possible that some people completed it numerous times. ROA.1755. Finally, even if some individuals were still encountering challenges in obtaining Lilly's medicines, that is not at odds with the conclusion that Lilly's supply was meeting demand because those challenges could be explained by dynamics such as "ordering practices and incentives, cold chain logistical considerations, and retailer capacity constraints," ROA.1756, which have nothing to do with Lilly's supply.

Plaintiffs dismiss FDA's concerns about their evidence as "overblown," insisting that FDA should have given more credence to OFA's report because "inability to get a prescription filled at *two* pharmacies is as detailed as descriptions get on this scale," and the "vast diversity of zip codes" indicates nationwide issues. Pltfs.Br.49. But none of that excuses the failure to ask *why* the patient could not get a product at two pharmacies (manufacturer supply issue, pharmacy stocking

52

decisions, etc.), or fixes the problem that there is no indication of how the information was collected or of when the patient encountered the challenge. It was thus eminently reasonable for FDA to give this evidence little weight—a decision at the top of the list of issues on which agencies receive deference. *See Texas v. EPA*, 137 F.4th 353, 367 (5th Cir. 2025) (agencies "must weigh evidence and determine if some evidence is reliable while other evidence is not"). And "[t]he court's role is not to weigh the evidence pro and con" itself, but simply to determine whether the agency considered relevant evidence and whether there was a clear error of judgment. *Delta Found. v. United States*, 303 F.3d 551, 563 (5th Cir. 2002). Here, the agency plainly did, and there plainly was not.

3. FDA did not "ignore[]" the various news articles Plaintiffs submitted. *Contra* Pltfs.Br.49-50. FDA explicitly acknowledged those sources in its decision memorandum, noting that it "reviewed various articles and blog posts submitted by various groups, as well as other news coverage." ROA.1759. FDA simply found that they did not "contain probative evidence relevant to the analysis FDA must conduct to determine whether a shortage has resolved." ROA.1759.

It is not difficult to understand why FDA reached that conclusion. Take Plaintiffs' first example, an announcement dated December 10, 2024, stating that a national retail pharmacy "is no longer taking new GLP-1 patients" because of "market demand." Pltfs.Br.49 (quoting ROA.3553). This announcement addresses

"GLP-1 patients" generally, not just those in the market for Lilly's tirzepatide products—and it is undisputed that GLP-1 medications manufactured by a different company (Novo Nordisk) *were* in shortage at the time. The announcement therefore has little to say about Lilly's ability to meet demand for its products.

Plaintiffs' other cited articles are similarly unhelpful:

- ROA.2185-95: This article relays statements from Lilly's CEO discussing shortage and compounding as a general matter. Those statements say nothing about whether a shortage persisted, and the article contains no data or other information that contradicted any of Lilly's submissions.

- ROA.2204-06: While this article noted some patient frustration in getting Lilly *or Novo* prescriptions filled, it acknowledged that those difficulties might be owing to "insurance hurdles" or "high cost," making it of little relevance to evaluating supply and demand.

- ROA.2249-52: This article relays statements from Novo's CEO, not Lilly's. FDA reasonably declined to give much weight to statements from another company's CEO who has little to no insight into Lilly's capabilities to meet demand for its products.

- ROA.3464: This Hims & Hers press release discusses its tracker, which is unhelpful for the reasons FDA explained. *See* ROA.1755-57.

- ROA.3509-26: This article covers President Biden's proposal to add coverage for weight-loss medicines to Medicare and Medicaid. That proposal was uncertain to go anywhere at the time, and President Trump subsequently stated that his administration is not planning to pursue it.[11]

- ROA.3572-81: This article has a few paragraphs describing two pharmacists who were temporarily unable to obtain sufficient quantities of Lilly's products. Even taking this anecdotal evidence at face value, it cannot sustain the full weight of Plaintiffs' arguments, as temporary, isolated events are

---

[11] *See* Alice Park, *Medicare Will Not Cover GLP-1 Drugs for Weight Loss*, Time (Apr. 7, 2025), https://perma.cc/FKJ6-2R4K.

neither uncommon nor indicative of a shortage nationwide, which is what the statute requires.

- ROA.3745: This article discusses Ozempic, which Lilly neither manufactures nor sells, rendering it of no value in determining whether *Lilly*'s medicines were in shortage.[12]

In short, FDA considered Plaintiffs' "news" submissions and gave them little weight for the same reason it gave little weight to Plaintiffs' other submissions: They suffer from severe evidentiary limitations when it comes to the question of whether the nationwide shortage of Lilly's medicines persisted. That decision was eminently reasonable.

4. Finally, FDA properly evaluated sales volume of compounded tirzepatide in its consideration of demand. Plaintiffs assert that FDA committed legal error in articulating that the "relevant demand … is the demand for the approved drug product, and *not* the demand for … a compounded tirzepatide drug." Pltfs.Br.50. But FDA correctly explained why the statutory text precludes treating approved products and compounded products as one and the same when assessing supply and demand, as that would lead to the nonsensical result of an infinite loop of shortage declarations and resolutions. *See* ROA.1760-61 & n.103. To be sure, as FDA recognized, *see* ROA.1761, ROA.1765, demand for compounded products during a

---

[12] Plaintiffs also cite a submission detailing statements from a ▮▮▮▮▮▮ earnings call on November 1, 2024. Pltfs.Br.49-50. That document, however, does not appear to be part of the administrative record.

shortage is still relevant—but only to the extent it would translate into demand for the approved product if those compounded products were no longer available.

Plaintiffs claim that FDA erred in its assessment of that question because the data before it showed a significant market for compounded drugs while Lilly's medicines were on the shortage list. Pltfs.Br.51. But FDA acknowledged that "significant compounding" in its projected-demand assessment ROA.1761. It just found that Lilly could meet demand even assuming that some (or even all) of the compounded market translated to demand for Lilly's products once that market was shut down. *See* ROA.1762-66.[13] Plaintiffs offer no basis to second-guess that reasonable and reasonably explained determination.

*    *    *

In sum, FDA considered all the evidence before it and provided entirely reasonable explanations for why it found Lilly's thorough, quantitative data presenting holistic supply-and-demand assessments more probative than Plaintiffs' scattershot evidence, much of which did not even clearly address Lilly's products, let alone document any shortage of them. And FDA's conclusion that Lilly's supply

---

[13] The best evidence Plaintiffs put forward on this front was a news article claiming that compounding pharmacies may be "provisioning up to ▮▮▮▮ American patients with regular doses of semaglutide … or tirzepatide." ROA.1763. Setting aside that the compounding market of *semaglutide* is not the compounding market for *tirzepatide, see* ROA.1763, ▮▮▮▮ is still considerably less than Lilly's excess inventory. *Cf.* ROA.1764.

was meeting or exceeding demand as of December 19, 2024, and would continue to do so finds ample support in the record—indeed, so much so that any other conclusion *would* have been arbitrary and capricious.[14]   The district court was therefore correct to reject Plaintiffs' efforts to second-guess FDA's determination. This Court should affirm.

## CONCLUSION

For the reasons set forth above, this Court should affirm.

Respectfully submitted,

s/Erin E. Murphy

| | |
|---|---|
| JAMES F. HURST, P.C. | ERIN E. MURPHY |
| DIANA M. WATRAL, P.C. | *Counsel of Record* |
| RYAN MOORMAN, P.C. | MATTHEW D. ROWEN |
| JAMES R.P. HILEMAN | KYLE R. EISWALD |
| KIRKLAND & ELLIS LLP | CLEMENT & MURPHY, PLLC |
| 333 West Wolf Point Plaza | 706 Duke Street |
| Chicago, IL 60654 | Alexandria, VA 22314 |
| | (202) 742-8900 |
| | erin.murphy@clementmurphy.com |

*Counsel for Intervenor-Appellee*

November 19, 2025

---

[14] Perhaps the strongest indication that FDA's determination was correct is the reality that Lilly has continued to maintain and build its surplus.  Indeed, Lilly has continued submitting supply-and-demand data to FDA, *see* ROA.1765, but the agency has not found any supply issues since its order—because there are none.

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin E. Murphy

**CERTIFICATE OF COMPLIANCE**

I certify that:

1) This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,993 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32.2.

2) This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

3) Any required privacy redactions have been made pursuant to Circuit Rule 25.2.13, the electronic submission is an exact copy of the paper submission, and the brief has been scanned for viruses using Windows Defender and is free of viruses.

November 19, 2025

s/Erin E. Murphy
Erin E. Murphy